First Trust Joint Stock Land Bank of Chicago, Appellant, v.
George W. McNeff et al., Appellees.

No. 42904.

December 17, 1935.

Valentine & Valentine, W. L. Cohrs and H. H. Lommen, for appellant.

Edward L. Simmons, for appellees George W. McNeff, Mary F. McNeff or Mary T. McNeff, being the same person, his wife; Ray J. Lotridge, Lelah McNeff, James Lotridge or James Dewey Lotridge, being the same person; Lelah McNeff Freeborn, Executrix of the Last Will and Testament of George W. McNeff.

Hugh G. Guernsey, County Attorney, for appellee Appanoose County, Iowa.

HAMILTON, J.—The note and mortgage involved in this foreclosure suit purport to have been executed by George W. McNeff and wife, Mary. The instruments were executed on June 17, 1926, and are in the principal sum of $15,000, bearing interest at the rate of 5¼ per cent per annum, both principal and interest payable on an amortization plan in seventy equal semiannual installments of $468.75 each, and one last installment of $340. The certificate of acknowledgment to the mortgage is in due and legal form and bears the seal of the notary public before whom the acknowledgment was taken. The notary, who was an attorney, was deceased on the date of the trial. Likewise, the notary's law partner was deceased.

The husband, George W. McNeff, died on January 9, 1933, after the commencement of the action, but before trial. The action was commenced on October 11, 1932. George W. McNeff filed no answer and made no defense and was at all times subject to default.

Everything in connection with the history of this loan went along smoothly until the loan became delinquent July 1, 1930. One A. K. Coomes was fieldman for plaintiff in the locality of this loan. His duties in a general way consisted of looking after farms owned and delinquent loans held by plaintiff company, working under special instructions as to what to do in each particular case when there was any trouble in his territory. On July 9, 1930, he was instructed to look after the McNeff item, and on that date went to the McNeff home, where he met both Mr. and Mrs. McNeff. He suggested that the money might be raised at a local bank by giving a chattel mortgage. At first Mrs. McNeff said she would have nothing to do with it. She said, ''I never signed that paper. I never signed that mort-

gage.'' That she would not sign any more papers. She began to cry and Mr. McNeff said, ''Why, mother, of course you signed that. You have forgot.'' Mrs. McNeff's version is that all he said was, ''Mother, you have forgot,'' and that he never said, ''Of course you signed that.'' She still contended that she did not sign it. However, both of them finally agreed to give a chattel mortgage to the bank and Mr. McNeff, accompanied by Mr. Coomes, went over to the bank, but the banker wanted too much security to suit Mr. McNeff, so he went back to the house to see his wife. What was said between Mrs. McNeff and her husband is not disclosed, but they arranged between themselves to use some money the wife had on deposit in the bank and Mr. McNeff came back to the bank somewhat elated, carrying with him his wife's certificate of deposit, duly indorsed by her. It was cashed and with the money a draft was procured for the payment of the delinquent July installment, consisting of $89.92 principal and $378.83 interest. Three other installments were paid on this loan, and, despite her testimony to the contrary, we are satisfied, from the evidence, that Mrs. McNeff contributed part of the money with which these payments were made, and there is no evidence that she ever again raised any question about the execution of the note and mortgage. Therefore, it is evident that the little colloquy above referred to between Mrs. McNeff, her husband, and Mr. Coomes on July 9th was not at that time considered very seriously by her or any one else. Although the import of her testimony now is that her husband forged her name to a $15,000 note and mortgage and that the notary public, who was an attorney and presumably knew the law, made a false certificate of acknowledgment to the mortgage in violation of the laws of this state, she never again, so far as this record shows, referred to the matter to her husband or her daughter, who was on the witness stand as a witness in the case, or to any one else, and there is no evidence of any domestic trouble of any kind. These good people lived on one farm for twenty-one years and there is not another syllable of testimony that there were any hard feelings or misunderstandings or any motive or cause of any kind that would lead Mr. McNeff to commit this grievous wrong of which she now impliedly accuses him. He lived only a short time after this suit was started and only a few weeks after she had made demand in writing for the possession of the note and mortgage for the purpose of inspection.

Up to the time of his death, in so far as the record shows, this matter was never again discussed with her husband or any one else, except that it is fair to infer that she did, after suit was commenced, talk with her attorneys in reference to the matter and they in turn prepared and filed an application for the inspection of the note and mortgage, but the record is as silent as the grave in which her husband lies as to any word about this matter between them.

On the other hand, it seems to be fairly well proven, at least to the satisfaction of this court, that her signature on the note and mortgage was not written by herself, but by someone else, presumably her husband. That is the inference to be drawn from the circumstances surrounding the case, although no one testifies positively that the wife's signature is in his handwriting. We are left entirely in the dark as to any explanation in reference to how it came about that someone else affixed her signature to these instruments. There is nothing in the record suggesting a reason for someone other than herself signing her name to this note and mortgage.

The evidence shows that she had a bank account of her own, signed her own checks, deposited her own money in the bank, and there is no evidence that she was sick or indisposed at the time, and no circumstances of any description indicating a reason for her name being affixed to these instruments by Mr. McNeff, or whoever wrote her name thereon. No attempt was made to elucidate regarding this matter.

Her correct name is Mary T. McNeff and it is claimed that the name on these instruments is Mary F. McNeff. We have examined the original note and mortgage and the initial letter is open to doubt as to whether it is a "T" or an "F". However, we do not think for the legal bearing it has on the question in this case that this is a matter of great importance. Her first name was "Mary", written out in full, and she is described in the acknowledgment as "wife" of George W. McNeff. This points her out and separates her from any one else by the name of McNeff, and is a correct identification of the individual referred to. The notary does not certify to the signing of the name. The notary certifies that "personally appeared, George W. McNeff and wife, Mary F. McNeff." Mr. McNeff had but one wife. How this mistake occurred can only be surmised. In the original application for the loan introduced in evidence, un-

der the head of "wife's name in full", is written, Mary F. Mc-Neff. This application was no doubt filled out by the agent who assisted Mr. McNeff in obtaining the loan, and for some unknown reason he got the initial letter wrong, and this discrepancy is probably accounted for by the fact that thereafter, in making out the note and mortgage at the home office, they followed the application, and the same were so executed to avoid returning the papers for correction. This is only based on surmise and inference, drawn from personal observation in the former experience of members of this court.

 The issues under the pleadings involve a question of the due execution of these papers and the question of ratification and estoppel. We will first consider the question of the execution. Appellees contend that this question is not properly raised, because not specifically assigned as one of the grounds for reversal, and cite Rule 30 in support of their contention. This is an equity case presenting questions of fact, trial de novo, and no errors need be assigned.

 We start out with a legal proposition which is well established by this court in this state, that where the certificate of the notary is in due and legal form, the instrument is admissible in evidence without further proof, and the burden is upon the person challenging the truth of its contents to prove his contention by clear and convincing evidence. This court has repeatedly said that "great weight is given to the certificate of acknowledgment." Hutchins v. Jones Piano Co., 209 Iowa 394, at page 397, 228 N. W. 281, 282. A notary public is an officer under oath and under bond and is presumed to obey the law and perform his official duty, and if he misstates material facts in the certificate, he is not only guilty of a misdemeanor, but he is liable for damages. Code 1931, section 10104. Therefore, unless Mrs. McNeff, the appellee, "has overcome the facts affirmed in the certificate of acknowledgment by clear, satisfactory, and convincing evidence, the same must stand as true." Northwestern Mutual Life Insurance Co. v. Blohm, 212 Iowa 89, 234 N. W. 268, 272.

It should be borne in mind that the question we have here is not as to the genuineness of her signature, but that of the acknowledgment of the execution of the instrument as her voluntary act and deed, and as to this proposition the burden is upon the complaining party, despite the fact that she has, under the

provision of section 11218 of the 1931 Code of Iowa, denied the genuineness of her signature under oath.

As stated in Gribben v. Clement, 141 Iowa 144, quoting from page 153, 119 N. W. 596, 599, 133 Am. St. Rep. 157:

"The defendant denied only the genuineness of her signature. That of itself would not defeat her liability on the mortgage. She did not deny that she had appeared before a notary public and acknowledged the execution of the instrument in the manner certified to by him; and, if she had made such denial, it would not of itself necessarily be sufficient to overcome the weight of such certificate. If she acknowledged the instrument before the notary public, it was quite immaterial whether her name was put to it by her own hand or by the hand of another."

And again in Currier v. Clark, 145 Iowa 613, at page 617, 124 N. W. 622, 623:

"So far as the mortgage was concerned, the certificate of acknowledgment was sufficient proof of its due execution by the acknowledging parties. It was not essential to its validity that their names should have been signed in their own handwriting. If they adopted the signatures, by whomsoever made, and acknowledged the instrument, it was a valid instrument. The certificate of the notary in such a case will not be lightly overcome."

This is a rule based upon public policy for the protection and security of titles and rights in real estate, and it is a universal rule that instruments which have been duly acknowledged, filed, and recorded may not be lightly set aside. Young v. Duvall, 109 U. S. 573, 3 S. Ct. 414, 416, 27 L. Ed. 1036.

In the case of Morris v. Sargent, 18 Iowa 90, at page 98, we find the following pronouncement:

"It is not to the genuineness of the signature that the officer certifies, but that the party acknowledged the instrument as his or her voluntary act and deed. If the name is affixed by the grantor himself, or another one for him, and the instrument is duly acknowledged, it is sufficient. * * * The whole burden of proof is upon complainants to rebut the effect of such certificate. The officer acts under oath, and is liable to be indicted and heavily fined if he knowingly states a material untruth in his certificate." See, also, Vanderveer v. Warner, 191 Iowa 1106,

at 1111, 183 N. W. 472; Herrick v. Musgrove, 67 Iowa 63, 24 N. W. 594.

In the case of Borland v. Walrath, 33 Iowa 130, the court again states:

"Public policy demands that instruments in writing pertaining to the titles of real estate, which are authenticated in the manner pointed out by the law, should not be lightly set aside. But they cannot be sustained against the positive and explicit evidence of credible witnesses. * * * Questions of this character can never be determined with absolute convictions of certainty."

The doctrine of strict proof is especially applicable in a situation such as we have in this case, where the testimony of Mrs. McNeff, because of the death of all other parties having knowledge of the facts, is incapable of contradiction. Where a witness testifies concerning a fact not capable of being denied because the lips of all persons who might deny the same are sealed in death, such testimony should be scrutinized jealously and weighed cautiously, and its credibility subjected to the most severe tests. Bohen v. North American Life Insurance Co. of Chicago, 188 Iowa 1349, 177 N. W. 706.

As stated in Watson v. Richardson, 110 Iowa 673, at page 678, 80 N. W. 407, 409:

"Much of the testimony is not subject to direct contradiction. * * * Such testimony must necessarily be tested by its own inherent probability or improbability, by comparison with the other evidence in the case, and by the ordinary rules of human conduct under similar circumstances. * * * From the nature of the evidence given, it is not subject to any worldly sanction; it being obviously impossible that any witness should be convicted of perjury for speaking of what he remembers to have been said in a conversation with a deceased person."

And again in Holmes v. Connable, 111 Iowa 298, at page 301, 82 N. W. 780, 781:

"The lips of the only two witnesses who could deny it are forever closed. The only person who could controvert the admissions alleged to have been made is the dead man against whose estate this claim is produced. There is no defense that

can be made, save as it may be found in the improbability of the stories of the plaintiff's witnesses, when tested by comparison with other evidence in the case, or the ordinary rules of human conduct under similar circumstances. * * * 'It is incumbent on the court to look upon such evidence with great jealousy, and to weigh it in the most scrupulous manner, to see what is the character and position of the witnesses generally, and whether they are corroborated to such an extent as to secure confidence that they are telling the truth.' "

This case quotes from Pennsylvania (Graham v. Graham's Ex'rs, 34 Pa. 475) the following:

"The temptation to set up claims against the estates of decedents—particularly such decedents as have left no lineal heirs—is very great. It cannot be doubted that many such claims have been asserted which would never have been known, had it been possible for the decedent to meet his alleged creditor in a court of justice. * * * Such claims are always dangerous, and when they rest upon parol they should be strictly scanned."

The temptation referred to in the last quotation is no greater under circumstances such as are related in that case, and other similar cases, than is the temptation to deny liability, born of the great financial distress in which debtors have found themselves in the last few years; and the duty resting on the court is just as imperative to scrutinize the testimony of one situated as was the appellee in this case, with no person living who could deny or gainsay her testimony that she never authorized her husband, or anyone else, to sign her name and never appeared before the notary and acknowledged the instrument to be her voluntary act and deed. As to both of these propositions, she stands alone, with no corroboration whatever, other than the fact that the signature is not in her handwriting, and the circumstance that there is nothing in the record to indicate why she did not affix her own name to the papers. On the other hand, we have the solemn certificate of the notary attesting the document, executed in regular form of law, and, in addition to this, we have the statement of the husband.

It is unfortunate we do not have the testimony of Mr. McNeff explaining the circumstances surrounding the execution of this instrument. But even without such explanation, must a

court of equity on the testimony of Mrs. McNeff alone on this particular subject of the voluntary execution of the instrument brush aside the certificate of the notary and the declaration of the husband, and by its findings impliedly hold that without any reason or motive to be found in this record anywhere that this man by fraud and stealth committed this grievous offense against his wife, in violation of the statutes of this state, and that he connived with the notary in perpetrating this fraud, and in so finding brand the notary, who has long since gone to his reward, as a criminal? It must be admitted that certainty is out of the question, we can but deal with probabilities. What would ordinarily be the conduct of such a man under the circumstances disclosed by the evidence? That the husband knew of the circumstances surrounding the execution of these instruments is unquestioned. Whoever affixed Mrs. McNeff's signature must have done so with the knowledge and consent of Mr. McNeff. Had anyone connected with the loan company, by stealth or fraud unknown to the husband, affixed his wife's name to these papers, he would certainly have been the first to evidence his displeasure and disapproval of such conduct. But instead of joining with his wife in her denial of liability, we find him taking the opposite course. In her own testimony she says that in answer to her denial he laughed and said, "Mother you have forgot." He did not join in her demand to see the papers. She says she did not know her name was on the papers until about July 4, 1930, just prior to the time Mr. Coomes called on them. She first said she did not remember when she first learned about her name being on the mortgage.

She says she does not know what became of the money obtained by the mortgage. The evidence in this case shows that Mr. McNeff owed the bank at Mystic, Iowa, $6,236.83, and that he owed the Centerville National Bank $3,261.79. There can be no question but that the money obtained from this loan went into his checking account; that he wrote checks immediately paying off this indebtedness at these two banks, and other checks, exhausting the entire loan, except $574.60, which was his balance on July 27, 1926. Therefore, this money or the greater part of it went to augment his estate, in which Mrs. McNeff now shares as his surviving spouse. There is nothing unjust or inequitable in the demands on the part of the plaintiff; on the contrary, the equities are with the plaintiff.

Mrs. McNeff says she does not remember of signing these notes at the banks with her husband, that to her best recollection she did not so sign, and here again we find that one of the bankers, who might have had some personal knowledge of this matter, is dead. It is possible that these farmer folk living in peace and harmony on one farm, working and struggling through sunshine and shadow for all these years, could have been so reticent in revealing to each other their business affairs, so aloof from each other in sharing their joys and life's burdens and sorrows, that all this business could have been transacted by Mr. McNeff without his wife knowing about it and having any share in it; but to say the least, it is not probable. It seems to us that the probabilities are against the reasonableness of the claim which she now makes against the due execution of this instrument, and as to her knowledge of what was going on around this farm home, and, as heretofore stated, in matters of this kind, the court cannot determine the truth of the situation with definite certainty. We have but to weigh the evidence and look at the reasonableness of the circumstances and probabilities and to ascertain, if possible, on which side is the greater weight of evidence.

We are unable to say that the appellees have by clear, satisfactory, and convincing proof overcome the truth of the statements contained in the notary's certificate.

Mrs. McNeff's entire testimony is greatly weakened by her statement that she contributed nothing toward the payment of the interest on this loan. She testified, "I did not at any time pay any interest or principal on this note and mortgage." This statement is not borne out by the record, as is plainly evident from the records of her checking account in the bank. On January 26, 1932, an installment in the amount of $468.75 was indorsed on the note in suit. On January 25, 1932, the day before this credit was made, a certificate of deposit in the sum of $415.73, which she held on the Iowa Trust & Savings Bank, was indorsed by her and cashed. On this date she had a balance in her checking account of $94.98. A deposit was made on this date of $373.77, making a total balance in her checking account of $468.75. On this same date there was a debit in this checking account for exactly $468.75, the exact amount of the payment credited on the note in suit in Chicago the next day. True, George W. McNeff purchased the draft but where did the money come from? Can anyone doubt the meaning of this record?

This good woman is mistaken, and in her zeal to escape liability has, we fear, fallen into error.

It is contended by counsel for appellees in his argument that the money furnished by the wife was loaned to the husband. We do not find that this argument is supported by competent proof, and even were this true, there would be little foundation for expectation on her part that the same would ever be repaid, in view of the financial distress under which the husband seemed to be laboring. It, for all practical purposes, amounted to a gift. There is no claim that any note was taken for any money thus loaned, except for one item, and there is no competent evidence that this note represented money loaned to the husband for a payment upon this interest, but the fair and reasonable inference to be drawn from the execution of the note is that such was its purpose.

It must be remembered that she nowhere in this record denies knowledge of this loan. She says she does not know where the money from this loan went, that she did not get any of it. She says she never saw the note and mortgage until after suit was started. She does not claim that she was ignorant of the fact that a note and mortgage had been given and was in existence, but she says she did not know her name was on the same until some time in July, 1930. As to whether or not her conduct after she claimed she learned her name was on the note and mortgage amounts to a ratification and estoppel, it is not necessary for us to determine. To say the least, such conduct does have a very definite bearing upon the good faith of her contention that she never authorized her husband to sign her name to the mortgage and that she never acknowledged the execution of this instrument. Such conduct is entirely out of harmony with the idea advanced by counsel for appellee that there was an intentional forgery of her signature upon this instrument.

If the conclusion we have reached in this case appears to be harsh, let us conclude with the language of Justice Harlan of the United States Supreme Court in the Duvall case, supra, wherein he says:

"The mischiefs that would ensue from a different rule could not well be overstated. The cases of hardship upon married women that might occur under the operation of such a rule are of less consequence than the general insecurity in the titles to real estate which would inevitably follow from one less rigorous."

1236

We think the court was in error in not granting a decree of foreclosure as to the entire real estate pledged as security and ordering execution to issue for the sale of the same, or so much thereof as may be necessary to satisfy the judgment, interest, costs, and accruing costs. It therefore follows that the judgment and decree of the lower court is reversed and the cause remanded, with instructions to enter a decree in accordance with the findings of this court.—Reversed and remanded.

DONEGAN, ALBERT, ANDERSON, and POWERS, JJ., concur.

MITCHELL, J., dissents.

KINTZINGER, C. J., and PARSONS and RICHARDS, JJ., join in dissent.

MITCHELL, J. (dissenting).—I find myself unable to agree with the majority opinion and therefore respectfully dissent.

In the opinion it is conceded that Mary T. McNeff never signed the note or mortgage. So we start out with the proposition that the signatures attached are forgeries.

The appellant relies solely upon the presumption carried by the notarial certificate. Mary T. McNeff, under oath, denied the signature to both the note and mortgage and that she acknowledged same. Thus we find that we have a case where the signatures are conceded to be forgeries, and the uncontradicted, undenied testimony of Mary T. McNeff that she did not appear before the notary and acknowledge this instrument and did not authorize any one to acknowledge it for her.

Let us look now at the cases relied upon in the majority opinion. In Gribben v. Clement, 141 Iowa 144, 119 N. W. 596, 133 Am. St. Rep. 157, the alleged maker did not deny that he acknowledged the instrument, and only denied signing it. In the case at bar there is the admitted fact that Mary T. McNeff did not sign the instrument, and her denial, under oath, that she did not acknowledge the signature. In the case of Currier v. Clark, 145 Iowa, 613, 124 N. W. 622, the evidence shows that the agent who signed the instrument for the defendant was authorized to do so, and, in addition to that, the notary public who took the acknowledgment testified in support of his certificate, and the attack thereon was but a mere unsupported denial. In the case of Vanderveer v. Warner, 191 Iowa 1106, 1108,

183 N. W. 472, there is a dispute in regard to the signature. There is the testimony of the notary who took the acknowledgment that she acknowledged it before him. In the case of Borland v. Walrath, 33 Iowa 130, there is a dispute in regard to the signature, and the sworn testimony of the notary public that it was duly acknowledged before him. In that case the court said, at page 133:

"Public policy demands that instruments in writing pertaining to the titles of real estate, which are authenticated in the manner pointed out by the law, should not be lightly set aside. But they cannot be sustained against the positive and explicit evidence of credible witnesses."

In the case at bar we have the positive and explicit evidence of Mary T. McNeff that she did not acknowledge the instrument, and there is nothing in this entire record, as I read it, that would lead any one to believe that this woman of seventy-one years was not telling the truth.

In the case of Morris v. Sargent, 18 Iowa 90, the widow denied her signature. The notary swore under oath that she did acknowledge it. This court said that while the burden of proof is upon the person denying the notary's certificate, which must be accepted prima facie, nevertheless, the party cannot be concluded by an instrument she never signed or by a certificate that would estop her from showing that she never appeared before the officer certifying the acknowledgment. Mrs. Morris testified that she did not sign the instrument and did not appear before the notary public, and the court said that she must either be disbelieved entirely and appear to be swearing falsely or that he would be forced to the conclusion that she did not sign the deed or acknowledge the instrument. There is no testimony in the case except that of Mrs. Morris. The court believed her and held in her favor. It seems to me that the case at bar is stronger than the Morris v. Sargent case, for it is conceded that Mrs. McNeff did not sign the instrument, whereas in the Morris v. Sargent case it is a disputed fact whether or not Mrs. Morris did.

Thus we see in reading the cases cited that there was additional evidence to that of the acknowledgment. There was in these cases the testimony of the notary public who took the acknowledgment that the instrument was duly acknowledged before him, whereas we are dealing here with a case in which the

signature is a forgery, and in which there is the uncontradicted testimony of Mrs. McNeff that she did not acknowledge the instrument. But, the majority say, ''On the other hand, we have the solemn certificate of the notary attesting the document, executed in regular form of law, and, in addition to this, we have the statement of the husband.''

The only statement of the husband is that which was made to the field agent of the appellant company at the time that he first went to see McNeff. I quote from his evidence, as set out in the abstract: ''Mrs. McNeff said she wouldn't have anything to do with it because, she said, 'I never signed that paper. I never signed that mortgage,' and she said she wouldn't sign any more papers. She began to cry and Mr. McNeff said, 'Why, mother, of course you signed that' and I said, 'Mrs. McNeff, you would have to sign it or the bank wouldn't loan the money.' She contended she didn't.''

Thus we find from the sworn testimony of this representative of the mortgage company that Mrs. McNeff contended she did not sign the instrument. The majority place great weight upon the fact that her husband said, ''Why, mother, of course you signed that. You have forgot.'' I am unable to see where this statement, if it is true, is any proof that Mrs. McNeff did acknowledge the instrument, for her husband was in error when he made the statement that his wife had signed the instrument, it being conceded in the opinion that she did not sign it. So what weight does this testimony of the husband have, when he said in the presence of the field man that his wife did sign the instrument? In truth and in fact she never signed the instrument.

There is another circumstance which seems to me to add weight to Mrs. McNeff's story. The acknowledgment of the mortgage is introduced. It recites that a certain person, Mary F. McNeff, acknowledged, not Mary T. McNeff. But the majority pay little attention to this discrepancy in the signature. I cannot pass over the difference in the names as lightly as they do. There can be no claim that the error in the name was merely clerical or typographical; it was not. The name appeared exactly the same in the note and mortgage, everywhere, in the body, signature, and acknowledgment; in some six or eight places it is written Mary F. McNeff. The abstract of title which was furnished to the appellant company showed that the wife of

George W. McNeff was Mary *T*. McNeff. Whoever was guilty of this fraud simply was mistaken as to what appellee's name was, and it seems to me that some weight should be given to the fact that there was a mistake in the intitial used. Would not the notary, if Mrs. McNeff had appeared before him have asked, "Is your name Mary F. McNeff?" Is it not reasonable to believe that before the acknowledgment was taken the notary would have ascertained whether or not it was Mary F. McNeff or Mary T. McNeff? It seems to me that this is evidence to show that the instrument was not acknowledged and bears out the story which Mrs. McNeff told. In order to sustain the majority, one must disbelieve the story that Mrs. McNeff told, for her story is an absolute denial of the acknowledgment of the instrument. Mrs. McNeff is a lady advanced in years. She and her husband for more than twenty-one years lived upon the farm covered by the mortgage in question in this case. No one took the witness stand to swear that she is not a truthful individual; that she has not been considered worthy of belief in the community in which she has lived all of these years. From the day that the field agent of the appellant company came to see the McNeffs, she has continually denied that she signed the instrument or acknowledged it. Add to this the fact that this lady appeared in court; that the distinguished and able trial court heard her testify upon the witness stand, had an opportunity to observe her and form an opinion as to whether or not she was telling the truth, not only from the evidence which was written and spoken, but also from the indefinable something that associates itself with every person and reveals in gesture, facial expression, and tonal qualities of voice whether or not that person is telling the truth.

True, this case is triable de novo here, but in trying to answer the one question in this case—whether or not Mrs. McNeff told the truth—I cannot overlook the fact that the lower court believed her.

The majority opinion lays much stress upon the fact that after the note became due her husband made a payment thereon with her money. Personally, I can see nothing peculiar about her conduct at that time. The husband first tried to get the money at the bank, but being unsuccessful he went to his wife. The evidence shows that he secured this money from her. Furnishing the money to her husband while he was in distress would not imply a ratification of the signature or indebtedness on her

part. Is there anything surprising about a wife loaning or giving to her husband, under the conditions which confronted McNeff, money to help him pay an obligation or the interest on one that he owed? Men finding themselves in financial difficulties often secure aid from friends or members of their family. Merely securing such aid from the wife, or from the husband, could not be held an admission of indebtedness by the spouse. It would be an extreme commentary on justice to say that either a husband or wife, finding themselves in financial difficulties, could not turn to their spouses for assistance. If it could not be obtained there, if the wife had the ability to furnish it, where could he secure it? There is no reason why the wife could not have loaned or given him the money. If it was a gift, or a loan, such fact would not result in making the wife liable on the indebtedness. And there is no evidence in the record tending to show that it was anything else; in fact, the majority opinion concedes ''it for all practical purposes amounted to a gift.'' I find no evidence of ratification by the wife.

Under the circumstances in this case, where the husband is dead and the notary is dead, where the signature was conceded not to be hers, how could Mrs. McNeff prove that she did not acknowledge the instrument, except by her own words? According to her story, she was not there when the transaction took place and knew nothing about it until the field agent of the appellant company came to her, and, according to his testimony, she immediately denied signing the instrument and knowing anything about the transaction. There was no other evidence she could produce, but to present herself in court, be sworn, and testify as she did.

I believe the lower court was right, and I would affirm its decision.

I am authorized to state that Chief Justice KINTZINGER and Justices PARSONS and RICHARDS join in this dissent.