WILLIAM QUAAS et ux., appellees, v. ORVAL E. QUAAS et ux., appellants.

No. 49417.

(Reported in 92 N.W.2d 427)

OCTOBER 14, 1958.

D. H. Smith and John G. Vernon, of Marion, and J. J. Locher, Jr., of Barnes, Wadsworth, Elderkin, Locher & Pirnie, of Cedar Rapids, for appellants.

L. M. Hullinger, Sr., and Robert M. Fassler, both of Cedar Rapids, for appellees.

OLIVER, J.—William Quaas and his wife, De Merle, instituted this suit against William's father and mother, Orval E. Quaas and Alice Quaas, to establish in William a one-half interest in fee simple in defendants' farm, and to partition the

property. Defendants denied plaintiffs' claims of part ownership and by counterclaim or cross-petition asked that their title be quieted against plaintiffs. Trial resulted in judgment establishing, in plaintiff William Quaas, an undivided one-half interest in the property, for his life only, denying partition and denying the prayer of defendants' cross-petition. Defendants have appealed. Plaintiffs have not appealed.

Defendant Orval E. Quaas was sixty-one years old when this case was tried. He lived upon and had operated for many years a 400-acre stock and dairy farm in Linn County, near Cedar Rapids. Part of this farm came from the estate of his father by inheritance and purchase and part had been purchased from others. Title to part of it was in defendants Orval and Alice Quaas and part of it in Orval alone. Defendants have four children, three daughters and plaintiff William O. Quaas.

In 1944 William, then age seventeen years, was taken out of school and commenced working on the farm. He testified his father said, "if I would stay home and help, he would give me half the farm." The first two years thereafter William received spending money and the use of an automobile. In 1946 he married and for the next two years worked on the farm on the basis of one fourth of the profits. He testified his father "said he wanted to put me on a fourth and then gradually—in a year or two—he would deed half the farm over. * * * Yes, if I would stay with him. * * * He always said he was going to give me one half the farm. He wanted me to have one half the farm as he thought I might leave him I guess." In 1948 William's share of the profits was increased to one half. He was then twenty-one years old. His one-fourth share had amounted to between $10,-000 and $12,000. "My father thought it was too much money and later he suggested a fifty-fifty agreement, and if I would stay with him, he would deed me one half the land."

December 30, 1950, plaintiffs and defendants went to the law office of Attorney D. H. Smith in Marion. Mr. Smith was attorney for Orval Quaas and had prepared income tax returns for William and the partnership. Orval Quaas testified the partnership agreement between himself and William was the first matter discussed—it had been previously discussed in connection with the preparation by Mr. Smith of their income tax re-

turns. Mr. Smith dictated to the stenographer and she prepared the partnership agreement in another room. She returned with it and Orval and William signed it—more than one copy was signed. In the meantime the deed to William had been discussed and was next prepared by the stenographer.

Mrs. Alice Quaas testified she read and signed the deed and knew the partnership agreement was signed, and that she had not previously made any commitments to pass any of her interest in the land to William and had not heard her husband make any promises to do so. There was no evidence of any such previous commitments or knowledge on her part.

An original of the pleaded Co-Partnership Articles of Agreement, Exhibit 1, and the original deed, Exhibit A, each dated December 30, 1950, were placed in evidence and have been certified to this court. Exhibit 1 appears to be a typewritten form of a general partnership farming agreement, with various blanks for names, dates, and special provisions, most of which blanks were filled in. After naming Orval and William as the parties, the agreement recites that whereas each of them "either own or have under their control real estate and personal property, which they have devoted to farming on a co-operative plan and now wish to merge all of their interests in all livestock, machinery", etc., "excepting only the real estate which each one will continue to be vested of title, in order to form an absolute partnership for all purposes."

Paragraph 4 states in part: "This agreement shall operate as a lease by each of the parties to lease his entire real estate, excepting [the following appears to have been filled in], as to the interest of Orval E. Quaas, he has leased and hereby confirms such fact for the life of William O. Quaas, an undivided one-half interest in all the farm lands of Orval E. Quaas, and his wife, included within the scope of this partnership agreement."

Paragraph 5 recites in part: "* * * each partner agrees to devote his entire working time to the operation of the firm's business, etc. Profits and losses of the business are to be shared and borne 50-50 in proportion to the interest of the partners."

The deed, Exhibit A, appears to be a Nebraska form of quitclaim deed. It names Orval E. Quaas and Alice L. Quaas of the

first part and William O. Quaas of the second part. It recites that the parties of the first part in consideration of the sum of one dollar and other valuable consideration have quitclaimed, etc. "a life estate only in and to an undivided one-half interest in the lands of the said grantors subject to farming operations between the grantor and the grantee and more particularly described in deeds of record of the grantors, including: [18 lines of legal description of the various tracts of land] and excepting all public highways, and excepting all lots in Auditor's Plat No. 302." The deed does not specifically recite the State or County in which the land is situated.

At the end of the partnership agreement, Exhibit 1, are the purported signatures of Orval E. Quaas and Wm. O. Quaas and the certificate of acknowledgment and seal of D. H. Smith, a notary public, of date December 30, 1950, and in regular form.

The father and son continued to operate the farm, sometimes called North Lawn Stock Farm, as equal partners until near the end of 1954. According to Orval Quaas, William became dissatisfied and wanted to quit feeding cattle and milking cows, and to operate only a grain farm, and Orval did not think this would provide sufficient income to support both families: "He [William] said that he wasn't going to stay and he didn't want to do so much. He was just going to grain farm and I says, 'William I couldn't do it; I love my livestock.' Along in the fall at corn picking time he says, 'I am not going to stay around here any more.' I didn't want him to leave. * * * He went to Chicago with the cattle and then to California. I didn't want him to leave home."

After William left the farm he purchased and operated a poultry ranch in California. He testified the cause of the disagreement with his father was that the father "wanted to take most of the farm and put it in lots and build houses on them." It appears twelve acres of Orval's land, not included in the farming operations and specifically excepted in the deed, Exhibit A, as lots in Auditor's Plat No. 302, were within the newly incorporated town of Hiawatha. This land was platted into lots and eight houses were built on them. Some time before he left the farm, William had bought an interest in an airplane, and

had about one hundred hours flying time, which he testified did not cause much trouble between his father and himself.

After William bought the California poultry ranch he returned temporarily to the Iowa farm and he and his father arranged a sale of the partnership property, including all the hogs and cattle, the payment of partnership debts and the settlement of its affairs. This sale was held in April 1955. William's wife testified the understanding was that Orval was to run the farm, himself, from then on out. There were some disagreements over the settlement but these were adjusted. William testified: "I took $14,000 with me to California, after paying all my borrowings to buy cattle", and paying taxes and expenses of the sale. In April and November 1955 quitclaim deeds to the real estate in question were requested by defendants and refused by plaintiffs. This suit was instituted in September 1956.

We have already stated William claimed and brought suit for a one-half interest in the land in fee simple. He testified his father "was going to give it to me like for a Christmas present", but did not act until December 30 (1955); and that he was in the lawyer's office when the deed (Exhibit A) was drawn, and read the deed but did not see the words "life estate." This part of the suit need not be considered in detail because plaintiffs did not appeal from the adjudication that William was not given an interest in fee simple in the farm.

William denied the signature "Wm. O. Quaas" on Exhibit 1, the partnership agreement, was his signature and testified that the first time he saw that agreement was after the suit was started. His wife testified the quitclaim deed was the only paper executed in the lawyer's office December 30, 1955.

I. Whether Orval and William Quaas entered into the Co-Partnership Articles of Agreement, Exhibit 1, is the main issue of fact. The judgment of the trial court states in part:

"Now, I have come to the conclusion that this deed conveys a life estate for the life of William O. Quaas. And I reached that decision independent of any testimony—oral testimony that was introduced by either side. I reached that from an examination of the deed itself. * * *.

"That brings us to the counterclaim or cross-petition of the

defendant and the relief asked for there. That relief is largely premised on establishing this instrument denominated in the trial record as Exhibit '1'. The court is not convinced that William O. Quaas ever affixed his signature to this Exhibit '1'. And the court finds that the burden of proof is necessarily upon the defendant to establish the essential allegations to permit him to recover under his counterclaim. And the court finds he has failed to establish those. Among other things, he has failed to establish this written agreement as such, and he relies almost entirely on this written instrument, Exhibit '1', to establish his right to have a conveyance back or the title to this whole thing quieted in the defendant. But we must take Exhibit 'A' as a verity, and the court does take it as a verity, and as having conveyed to and placed in William O. Quaas an undivided one-half interest in this real estate for the life of William O. Quaas. The defendants and cross-petitioners have not established that this deed was an integral part of an arrangement for the operation of this farm."

Defendants testified William executed Exhibit 1. Plaintiffs denied this. The judgment states the burden of proof was upon defendants to establish this agreement as such and that they had failed to do so. But the foregoing testimony was not the only evidence upon this issue. For the purpose of comparing handwriting defendants offered in evidence four canceled checks for $1000, $2269.51, $650 and $21,000 respectively, made by Orval payable to the order of William and bearing the latter's purported indorsements. Orval testified the indorsements were made by William. However, as we understand the record, the only purported signature he actually saw William write was the indorsement by William of his name on the back of the $21,000 check. William either denied or refused to admit the handwriting on any of the checks was his.

Hence, the only signature placed in evidence by defendants which could possibly be used as a basis for comparison would be that on the $21,000 check. Taking the circumstances into consideration, we find the evidence establishes that the signature upon the back of the $21,000 check was William's. The only purported signature of William offered by plaintiffs for comparison

was a signature made in September 1956 in connection with the pleadings in this suit. The record does not show whether the trial court made a comparison of the disputed signature on the contract with the signature indorsed on the $21,000 check. We have done so and, as nonexperts, are of the opinion they were made by the same person.

There are two propositions connected with the issue whether William executed Exhibit 1, neither of which appears to have been taken into consideration by the trial court.

One of these stems from the pleadings. Rule of Civil Procedure 100(a) provides: "If a pleading copies a writing purporting to be signed by an adverse party, such signature shall be deemed genuine for all purposes in the case, unless such party shall not only deny it, but support his denial by his own affidavit that it is not his genuine or authorized signature. * * *."

■ Defendants' counterclaim or cross-petition copied the partnership agreement, Exhibit 1, purporting to be signed by William and Orval. Thereafter plaintiffs filed a reply but did not comply with the provisions of rule 100(a). Later as a witness in the trial William denied the signature in question was his.

Defendants contend the effect of the failure to so plead such denial was that, in the language of the rule "such signature shall be deemed genuine for all purposes in the case, * * *." We have so held in cases decided upon the pleadings only. Evans v. Herbranson, 241 Iowa 268, 279, 41 N.W.2d 113, 120, 15 A. L. R.2d 925; Weik v. Ace Rents Incorporated, 249 Iowa 510, 513, 87 N.W.2d 314, 316, 317. However, in this case plaintiffs' reply was sufficient to permit the introduction of evidence denying William's signature.

■ The question thus presented was considered in Ainsworth Savings Bank v. Colthurst, 197 Iowa 363, 366, 195 N.W. 581, 582, which states: "The argument for plaintiff is that, in the absence of a written denial under oath, no issue was tendered on the question of signature, and that, therefore, the genuineness of such signature should be deemed conclusively proved or admitted. If the question were an open one, the argument would be very persuasive. But this statute has been in effect for more than 50 years, and has been repeatedly construed in

this regard. The substance of that construction is that, if the purported maker of the instrument fail to conform to the provision of this section, then he relieves the plaintiff of the burden of proof on that question. He may, nevertheless, by an unverified general denial or by a statutory denial put the question of genuineness in issue, with this qualification: that the burden of such issue will be upon the defendant, and not upon the plaintiff. In such a case, the signature is deemed *prima facie* genuine, and the plaintiff may put the instrument in evidence without further proof; but the defendant may, nevertheless, assume the burden of attack upon its genuineness. Such is the uniform holding of our cases. Douglass v. Matheny, 35 Iowa 112; Sankey v. Trump, 35 Iowa 267; Ashworth v. Grubbs, 47 Iowa 353; Sully v. Goldsmith, 49 Iowa 690; Brayley v. Hedges, 52 Iowa 623; Smith v. King, 88 Iowa 105."

The holding in the Ainsworth case was based upon section 3640, Code of Iowa, 1897. As to the question here presented, rule 100(a) is substantially the same as that section. See also McFerren v. First National Bank, 214 Iowa 198, 202 to 204, 238 N.W. 914; Hedinger v. Herweh, 239 Iowa 1146, 34 N.W.2d 202. We hold rule 100(a) is here applicable and that in the language of the Ainsworth case plaintiffs did "assume the burden of attack upon its [William's signature] genuineness."

The other proposition, apparently overlooked in the trial, was the effect of the certificate of acknowledgment of the notary public that Orval E. Quaas and William O. Quaas, to him known to be the persons named in and who executed the instrument, Exhibit 1, personally appeared before him December 30, 1950, and acknowledged that they executed the same as their voluntary act and deed. This certificate was in the language and form approved by Code section 558.39.

Section 622.26, Code of Iowa, 1958, provides in part that duly acknowledged private writings may be read in evidence without further proof. Code section 622.36 contains a similar provision applicable to instruments affecting real estate.

■ Northwestern Mutual Life Ins. Co. v. Blohm, 212 Iowa 89, 99, 100, 102, 234 N.W. 268, 272, states: "* * * after the acknowledgment accompanying the release was introduced in evidence, the duty of going forward with the evidence was then

cast upon appellant. That is true because the release was acknowledged before a notary public who duly certified such fact, and the certification is in due and regular form.

"Unless, then, the appellant has overcome the facts affirmed in the certificate of acknowledgment by clear, satisfactory, and convincing evidence, the same must stand as true. Morris v. Sargent, 18 Iowa 90 (l.c.95); Bailey, Wood & Co. v. Landingham, 53 Iowa 722 (l.c.724); Bird v. Adams, 56 Iowa 292; Herrick v. Musgrove, 67 Iowa 63 (l.c.65); Swett v. Large, 122 Iowa 267 (l.c.271); Johnston v. Linder, 168 Iowa 441; Vanderveer v. Warner, 191 Iowa 1106; Hutchins v. Jones Piano Co., 209 Iowa 394. In the Hutchins case, last named, we declared:

" 'Certification (in the *Hutchins* case) of the notary is in due and regular form. Hence, the burden was upon appellee to prove his contention (that the acknowledgment was not taken) by clear and convincing evidence. Great weight is given to the certificate of acknowledgment * * * (citing cases). The notary public who misstates the material fact in the certificate shall be liable for damages, and guilty of a misdemeanor. An officer is presumed to obey the law and perform his official duty. Roberts v. Roberts (176 Iowa 610), supra. Therefore, presumption is in favor of the acknowledgment.'

"* * *

"When taken together with all the facts and circumstances revealed by the record, we cannot say that the foregoing proof is so clear, satisfactory, and convincing as to support a finding that the notary's certificate on the acknowledgment is false and untrue. Putting the thought differently, appellant has not met the burden of proof cast upon him to overcome the statements contained in the notary's certificate."

Our most recent pronouncement upon this point is Stephenson v. Stephenson, 247 Iowa 785, 792, 793, 74 N.W.2d 679. Another decision is First Trust Joint Stock Land Bank v. McNeff, 220 Iowa 1225, 264 N.W. 105.

The record in the case at bar, considered in the light of the foregoing rules, requires the conclusion that Orval and William entered into the partnership agreement, Exhibit 1, as alleged by defendants. The contrary finding of the trial court was erroneous.

██ ██ II. We have already set out parts of the quitclaim deed, Exhibit A, from defendants to William for "a life estate only in and to an undivided one-half interest in the lands of the said grantors subject to farming operations between the grantor and the grantee * * *, including: [legal description] and excepting all public highways, and excepting all lots in Auditor's Plat No. 302."

The record shows the deed, Exhibit A, was prepared and executed immediately after the partnership agreement, Exhibit 1, and that each instrument was part of the same transaction. The deed states the conveyance is "subject to farming operations between the grantor and the grantee." At this point the question is, what is the meaning of the quoted clause? Appellees argue it is merely a double description of the property, and would write the clause, "being the subject of the farming operations between the grantor and grantee", etc. We do not agree the language is fairly susceptible to that interpretation. The word "subject" as used in the deed is an adjective. The interpretation appellees would give it in the suggested clause would make it a noun.

Considered alone the meaning of the clause, stating the conveyance is "subject to farming operations between the grantor and the grantee", is ambiguous. No other provisions in the deed clarify this ambiguity. However, when Exhibit A and Exhibit 1 are considered together it is at once apparent that the clause, "subject to farming operations", etc. has reference to the partnership operations. The two instruments were executed contemporaneously and affect the same parties and the same property. As stated in 16 Am. Jur., Deeds, section 175:

"It is a general rule of construction, well settled by the authorities, that in order to ascertain the intention of the parties, separate deeds or instruments, executed at the same time and in relation to the same subject matter, between the same parties, or, in other words, made as parts of substantially one transaction, may be taken together and construed as one instrument."

To the same effect is the language of 26 C. J. S., Deeds, section 91. It is clear Exhibit A and Exhibit 1 should be taken together and construed as one instrument.

That the father and son had for some time operated the farm as partners under oral agreement affords no substantial basis for concluding this rule is here inapplicable. It is fair to assume no written agreement was deemed necessary prior to the execution of the deed, Exhibit A.

III. Paragraph 4 of Exhibit 1 recites Orval has leased to the partnership, for the life of William, an undivided one-half interest in all the farm lands of Orval and his wife included in the partnership agreement. Also leased to the partnership was the other undivided half interest in the farm lands for William's life which his parents, as part of the transaction, were conveying to him by the quitclaim deed, Exhibit A. In this manner all the farm lands were leased to the partnership for the life of William. Moreover, the partnership agreement required each partner to devote his entire working time to the partnership business, except for time lost on account of illness or casualty. The provisions of the partnership agreement indicate the intention of the parties that it continue during William's life. Orval's testimony upon his examination by the court supports this conclusion.

He testified: "We wanted to combine this agreement. * * * Oh, we talked about it for a year or so before, see. * * * Well, he [the lawyer] was just going to put this up as a partnership deal, see; as long as the partnership was in effect, it was to be. * * * Well, William was to get one-half interest as long as either one of us was alive and work together. * * * The court: What about after you passed on, was anything said about that? A. He would go on the same as long as he was there."

William himself testified his father said, "he would deed half the farm over" if William "would stay with him. * * * He wanted me to have one half the farm as he thought I might leave him, I guess." His father had suggested a 50-50 agreement, "and if I would stay with him he would deed me one half the land."

Thus it appears that both the father and the son understood the gift to the son of a life interest in the farm was to be conditioned upon the son remaining on the farm and participating in its operation. The provisions of the partnership agreement, Exhibit 1, fit into and apply this understanding. We have

already held the deed and the clause in it, "subject to farming operations between the grantor and the grantee", should be considered with Exhibit 1.

Under the circumstances it is our conclusion the language should be interpreted as meaning the estate conveyed to William for his life would continue only as long as he continued the farming operations set out in the partnership agreement. William did not continue the farming operations as the deed (Exhibit A) and the partnership agreement required. His abandonment of these operations and his permanent removal to California terminated the "farming operations" in question.

Nor does the record present any valid excuse for this. William testified his only argument with his father was about the father selling some of the land and dividing it into lots.

"Q. You could have stayed if you wanted to? A. Been pretty rough. Q. What was it made it rough? A. Building houses all over the place and I would like to farm. Q. The houses were being built on a little fifteen-acre tract down next to Hiawatha? A. Look at them five years from now, though. Q. Were they not being built on a little fifteen-acre tract in Hiawatha? A. Yes, starting, yes. Q. And they weren't being built all around the farm? A. He was talking about on the west side, building over by Buffalo. Q. He platted a little area down next to Hiawatha? A. Yes."

The tract upon which the houses were built was excepted from the deed (all lots in Auditor's Plat No. 302) and was not included in the partnership agreement. Of course, William could have prevented the building and sale of houses on any part of the land included in the life estate conveyed to him. As a practical proposition no such operations could have been carried on or started unless William had joined in them.

It is our conclusion that defendants and each of them are entitled to judgment, quieting in them and against plaintiffs their respective titles to the various tracts of land in Linn County, Iowa, described in their pleadings.

The judgment is reversed and the cause remanded for judgment accordingly.—Reversed and remanded.

All JUSTICES concur.