(No. 19566.—

ORVILLE OLIVER *et al.* Appellees, *vs.* REVILO OLIVER *et al.* Appellants.

*Opinion filed June 20, 1930—Petition stricken October 8, 1930.*

SCHNEIDER & SCHNEIDER, ROBERT H. PATTON, and J. H. McFADDEN, for appellants.

W. R. HUNTER, F. A. ORTMAN, and ADSIT, THOMPSON & HERR, for appellees.

Mr. Commissioner Edmunds reported this opinion:

Orville O. Oliver, son of John L. Oliver, deceased, together with other parties, hereinafter designated as contestants, filed in the circuit court of Livingston county a bill to contest the will of Amaretta Oliver. Revilo Oliver and others, hereinafter designated as proponents, were named as defendants. The jury found that the contested document was not the last will and testament of Amaretta Oliver and that it did not bear her genuine signature. From the resulting decree proponents have appealed, their principal assignment of error being that the verdict is against the weight of the evidence.

Amaretta Oliver died in Iowa Park, Texas, in 1908, leaving her surviving no husband but three children—Revilo and John L. Oliver and Florence Oliver Ross. She was seized of over 1100 acres of land in Livingston county, Illinois, one tract of which was section 33 in Chatsworth township. The remainder was in Germanville township. Litigation over her holdings began in the circuit court of Livingston county in 1910. In that litigation Revilo, through various alleged notes, liens and trust agreements, asserted title to section 33 and a large portion of the Germanville land. Florence claimed section 33 under a deed from Amaretta. John L. maintained that all preferences should be set aside and the property distributed as intestate estate. The hearing was before a master and extended over a period of years, the case reaching this court in 1919. By the decision in that case (*Oliver* v. *Ross,* 289 Ill. 624,) this court held that Amaretta died intestate and seized in fee of all said property and directed the circuit court of Livingston county to enter a decree declaring the fee simple title thereto to be in Flora Oliver, (grantee of Revilo,) Florence, and the heirs of John L., deceased. Thereafter partition proceedings were brought in the circuit court of Livingston county. On July 26, 1921, while these partition proceedings were pending, Revilo filed a petition in the

county court of Livingston county for probate of an alleged will of Amaretta dated September 23, 1904. The county court denied the petition, but on appeal the circuit court of Livingston county admitted the instrument to probate as the last will and testament of Amaretta. This order was affirmed by this court in *Oliver* v. *Oliver,* 313 Ill. 612. The bill in the present case attacks this document, and was filed September 5, 1925. Trial was had at the January, 1927, term of the circuit court of Livingston county. The jury found that the will was not the last will and testament of Amaretta, that she was of sound mind at the time of its purported execution, and that the instrument did not bear her genuine signature. A new trial was granted, and proponents filed a petition for change of venue. By consent of contestants the cause was tried again at the October term, 1928, before a different judge, and the jury found the same as at the first trial. Explanation as to how the instrument was brought to light is made in *Oliver* v. *Oliver, supra,* and its form and content are there described. It is accordingly unnecessary to repeat the description here. Although in the present case the trial court refused to admit as evidence the decree in *Oliver* v. *Ross, supra,* and also refused to admit the will of Amaretta dated September 8, 1904, with codicil of July 6, 1908, the will dated January 27, 1908, the $64,000 note dated October 22, 1904, the deed to Flora Oliver dated October 25, 1907, the deed to Florence Ross dated January 27, 1908, and Amaretta's notice of ownership dated May 5, 1908, understanding of the issues will be facilitated by a reading of both *Oliver* v. *Ross* and *Oliver* v. *Oliver, supra.* These cases provide a history of the Oliver family and of the previous litigation, which this court has characterized as presenting "very unusual facts and circumstances."

George M. Joseph, one of the attesting witnesses of the contested will, died before the trial in the present cause, and his testimony was read from a bill of exceptions filed

on appeal from the probate of the will in the circuit court. His testimony was that he had lived in Cincinnati, Ohio, for the eighteen or twenty years immediately preceding the trial; that for nine years he had been employed there by the Bell Telephone Company as a private officer, his duties being to keep people who were paying bills lined up and to accompany money to the bank; that he formerly resided in Chatsworth, Illinois, where he lived on a farm for six or seven years; that he knew Amaretta Oliver since 1877, when he and his brother farmed her land; that in September, 1904, or 1905, he was living in Bloomington; that he had come to Chatsworth on the morning train and was on his way to the cemetery where his father and mother were buried when Amaretta met him on the street and asked him to come to her house, stating that she had some important business to transact; that he accompanied her to her home, where he found Judge Beach and Miss Cowden, the other attesting witness. He identified the contested will as the document which he there saw. He further testified that Judge Beach laid the document down on the table, then picked it up and handed it to Amaretta; that she looked it over; that Judge Beach referred to the way it was gotten up, referring to the first name on it being Amaretta Oliver and the last name Revilo Oliver on the same sheet; that Amaretta wrote in the date and signed it, then handed it to Miss Cowden, who looked it over, signed it, and handed it to witness; that witness looked it over, noting that Revilo was to get all of section 33 and something over 200 acres in Germanville township and was to take charge of all the land until everything was settled up and that Judge Beach was to get the property if there should be a contest; that witness then signed, and that Amaretta said she did not want Revilo to know anything about it while she was living. On cross-examination Joseph testified that he had not previously done any business for Amaretta directly and that she had never consulted him about her business, out-

side of the farm he lived on; that he returned to Bloomington that evening; that he never spoke to Miss Cowden before that day; that he never was back there after that; that he saw Revilo in court about 1914 when he was a witness for him, at which time the property covered by the will was in dispute; that as a witness at that time he might have identified some paper for Revilo but did not remember; that he had read the document in Cincinnati, where it was brought to him; that as a witness in the probate court a few months previous he might have answered that he did not know what land was given Mrs. Ross and Revilo because he had not given it any thought, but that he had since been studying it over and it was now clear.

Alma Cowden Franke, the other attesting witness, testified that she had been living in Chicago for five years, previous to which time she had been in South Bend, Indiana; that she first met Amaretta Oliver about 1897, when in answer to an advertisement she went to Amaretta's home as a governess for the latter's grand-daughter, Gertrude Ross; that she was there that summer and went away, and in a few years came back to help Amaretta out in the summer; that in the fall of 1904 Amaretta wrote a card to her at Jacksonville, where witness then lived, stating that they were going to move out West and would like for witness to visit them; that witness went and stayed a day or so; that Amaretta said she had made out her will because she was going to move away and in traveling something might happen on the journey; that Judge Beach and George Joseph came to the house; that Amaretta signed the will and put in the date, then witness signed it, then Joseph; that witness read it over, and on the last part of the page it said, in case of the death of Amaretta, Revilo was to have charge of the property until all debts were paid; that witness then said that the children would not like that, because they would think as soon as Amaretta was gone they should have the property; that someone (she thought Beach) said

to "wait until the next page and see what you think of that;" that Judge Beach said that it was a good omen that Amaretta's name was at the top of the sheet and Revilo's last; that witness said she never heard of a lawyer getting the property in case the heirs contested the will; that Amaretta said she put that in so the will would not be contested and that she did not want the children to waste the money in law, and said she did not want witness and Joseph to tell Revilo about the will until she passed away. On cross-examination witness testified that there were two sheets; that Amaretta said Judge Beach made out the will; that Revilo was not present when the will was signed but was living there while she visited and she supposed she saw him before or after the signing; that likely she did say at time of probate, in answer to the question as to how many sheets there were, "Do you think I could remember back nineteen years and tell you how many sheets of paper?" and that quite likely she also said at that time that she did not remember whether the sheets were pinned together; that after 1904 she first saw the instrument when it was brought to her at South Bend; that she had since read it over—she did not know how many times; that she did have a copy but must have lost it; that she was living in Jacksonville at the time she testified in the Ross-Oliver case; that at the time the will was executed she read it from beginning to end and remembered Amaretta's name came first on the first sheet and Revilo's last, and that Beach said that was a good omen. Witness also expressed the opinion that certain signatures and writings in the Bible, hereinafter referred to, were in the handwriting of Amaretta.

Edward Megquier testified for proponents that he had lived at Gary, Indiana, since 1917, where he had been employed for over eleven years as a steel worker; that he was born in Chatsworth, Illinois, and was living there in 1904; that he knew Amaretta ever since he was about ten years old, and also knew Revilo; that for fourteen years he was

in the printing business at Chatsworth and did odd jobs of printing for Revilo; that for seven years he published the *Chatsworth Enterprise;* that he had been in Amaretta's home many times; that shortly before she left Chatsworth in the fall of 1904 witness went to her house one afternoon and asked if Revilo was at home; that Amaretta said Revilo was not at home and invited witness in; that after some "small conversation" Amaretta said she had made her will, and went and got it and let witness read it; that he saw on it the signatures of Amaretta, Joseph and Miss Cowden; that he asked her, "Did you sign the will?" and Amaretta replied she did. He identified the contested will as the instrument which Amaretta there showed him. On cross-examination Megquier was asked why he asked Amaretta about signing the will, and he replied that it was because the fact of making a will seemed "a genuine thing"— "a gruesome thing"—to him.

John Walsh testified that he lived in Germanville township and had been farming part of the Oliver lands for twenty-six years; that he knew Amaretta Oliver for thirty-eight or forty years; that he often conversed with her regarding things he wanted done in the way of fencing and tiling; that she claimed that they could not afford to make the improvements he wanted; that he had a conversation with her the year before she left Chatsworth; that she talked about some trouble Revilo had got into when he first got married and the way he had made over the land to her, and said she intended to fix it before she left Chatsworth so the land would go back to Revilo.

In addition to exhibits in the way of notes and mortgages bearing admittedly genuine signatures of Amaretta Oliver, proponents introduced in evidence a Bible, which has been certified as an original exhibit. On its fly-leaf, which has been either cut or torn loose from the book, appears the signature "Amaretta Oliver." Scattered through the book are a number of memoranda, some written in pen-

cil and some in ink, and several of which are followed by the signature "Amaretta Oliver." One entry is, "Will September 23, 1904." Other entries record the purchase of tracts of land and the respective interests of Amaretta and Revilo therein. As to how this Bible was brought to light in 1921, C. C. Davis, the same man whose testimony was commented upon by this court in *Oliver* v. *Ross, supra,* and *Lyon* v. *Oliver,* 316 Ill. 292, testified that he had lived at Iowa Park, Texas, since 1900; that the population of Iowa Park was not to exceed 750; that he was a preacher there for four years; that at the time of testifying he was a salesman; that he was acquainted with Amaretta and Revilo Oliver; that he was often in Amaretta's home and associated with her for almost a year; that in 1907 he was conducting a harness and shoe repair business and became acquainted with Florence Oliver Ross when she brought some work into his shop; that he had been postmaster at Iowa Park from 1913 to 1927; that one afternoon while he was postmaster he received in the mail a registered letter from Revilo; that he "discovered it had something in it;" that J. C. Murphree came in almost immediately, and Murphree and Murphree's father went with witness to the Oliver house, opened a chest and found a Bible, which witness mailed to Revilo at Springfield, Illinois. Witness identified the Bible introduced in evidence as the one then and there found. On cross-examination Davis testified that he did not know whether there is more writing in it now than when he found it; that the Oliver house had been occupied continuously since Revilo left it in 1910 and possibly five or six different families had lived in it; that after three or four years witness had charge of it; that he could not recall the name of the family living there when the Bible was found or the family immediately before that; that he knew everybody in that country; that in the room they entered when he and the Murphrees went to the house was furniture stored there by Revilo, a chest, trunk and several boxes;

that the door to this room was opened by the lady living in the house; that the Bible was in the chest, which was locked; that he received the key to it in the letter which came that afternoon; that in the chest were packed bedspreads and quilts, and that he did not have to take all the stuff out before he found the Bible, which was wrapped in some brown paper between the folds of some quilts. The finding of the Bible in the chest in the manner just outlined was corroborated by Murphree, an attorney at Iowa Park. Revilo Oliver testified that when he left Texas in 1910 he stored several boxes and the chest in the house. In answer to the question if he knew whether the Bible was his mother's before her death, he replied: "I certainly do; I was there when the preacher gave it to her and saw her write her name in it at that time." Upon motion this statement was excluded.

To establish the genuineness of the signature on the alleged will proponents offered the testimony of Herbert Powell, a lawyer and banker of Fairbury; Warren D. Goodell, a banker of Loda; Emil L. Bansbach, assistant cashier of the Ridgely-Farmers Bank of Springfield; Frank H. Lowe, assistant cashier of the Ridgely-Farmers Bank of Springfield; Latham T. Souther, vice-president of the First National Bank of Springfield, and Ralph W. Gill, a lawyer, who had taught penmanship for fifteen years in business colleges and various high schools. Powell testified that in 1895 Amaretta negotiated with him a real estate loan, that he was familiar with her signature, and that the handwriting in which the will was signed, as well as that in the Bible, was that of Amaretta. Goodell testified that in 1899 Amaretta negotiated with him a real estate loan, that he was familiar with her signature, and that the handwriting in which the will was signed was that of Amaretta. Bansbach testified that he had compared the signatures on the various exhibits with those on the will and in the Bible and that they had all been written by the same party. Lowe,

Souther and Gill testified to substantially the same effect. Several of these witnesses went into some detail by way of calling attention to characteristics alleged to be common to both admittedly genuine and disputed writings.

On the point of signatures, contestants introduced a number of exhibits in the form of notes, and two letters, designated as the "Hunter letters," written about the time of the execution of the alleged will. Contestants offered the testimony of Charles Myers, assistant cashier of the Pontiac State Bank, J. H. Duis, cashier of the Flanagan State Bank, J. P. Lamon, cashier of the Saunemin State Bank, J. C. Greenbaum, cashier of the Illinois State Bank of Pontiac, C. R. Tombaugh, president and former cashier of the National Bank of Pontiac, M. H. Craven, cashier of the Odell bank, and John Doherty, vice-president and former cashier of the First National Bank of Dwight. Each of these witnesses testified that he had compared the signature on the will with signatures of Amaretta Oliver on the various exhibits offered by contestants the genuineness of which is not disputed by proponents, and that the signature on the will was not written by the person who wrote the signatures on these exhibits. Tombaugh went into some detail by way of calling attention to differences between the genuine and disputed writings. Contestants also offered the testimony of John F. Tyrrell and Jay F. Wood, whose business was that of examiners of disputed documents. They testified in detail regarding the various signatures of Amaretta which were in evidence, the characteristics or peculiarities of admitted signatures which did not appear in those disputed, the points of resemblance and difference between the admitted and the disputed signatures, and the reasons which led them to believe that the name signed to the will was not the genuine signature of Amaretta Oliver.

At the request of proponents the jury were instructed that in determining the question whether the purported will was signed by Amaretta Oliver they had a right to take

with them to the jury room, for comparison with the signature on that instrument, the signatures and handwriting on all documents admitted in evidence for that purpose, and that such comparison should be made and considered, in connection with all the other evidence in the case, in determining whether the purported will was signed by Amaretta as her last will and testament. All these original exhibits, as well as a number of natural size and enlarged photographs thereof introduced for purpose of comparison, have been certified with the record and we have had the benefit of them in the consideration of this case. By study of these exhibits it is possible to note a number of points of apparent difference between the signatures on the contested will and in the Bible on the one hand, and other signatures admittedly genuine on the other. In the signatures on the will and in the Bible the capital "A" is made in the form of a printed capital. "A," and the line which leaves it to connect up the "m" which follows has a trend which is rather downward. In practically all of the admittedly genuine signatures the trend of the corresponding line is plainly upward, and there is a very noticeable rise just before the "m" begins. The downward trend of this line in proponents' exhibit 2 (the signature on the fly-leaf of the Bible) is especially noticeable and is in marked contrast with the direction of the corresponding line of the admittedly genuine signatures offered by proponents in which the capital "A" is made in the same style, to say nothing of the corresponding line in contestants' numerous exhibits. The small "a" in the Bible signature and writings and in the signature on the contested will is clearly begun to the right of the up-stroke and is oval in shape. The small "a" found in the admittedly genuine writings is more round in shape and in almost every instance is plainly begun to the left of the up-stroke. In the few instances where it is not so begun its beginning coincides with the top of the up-stroke. The commencement of the capital "O's" in the Bible signature

and writings and in the signature on the contested will is higher than the last curve of the finishing stroke. The same relative position of start and finish is not found in the genuine signatures, where the start trends consistently lower than the top of the closing loop. Looking at the admittedly genuine "O's" upside down, practically all of them are in fairly good form for a capital "P," but this is not true of the disputed "O's." In the Bible signatures and that on the contested will the concluding stroke of the letter "v" ends well above the base line of the signature, and the line connecting it with the letter "e" following, extends horizontally to the point where the "e" begins. In the admittedly genuine signatures the "v" ends at a much lower point, relatively, and the line connecting up with the "e" dips very noticeably to the point of beginning of the "e" at or near the base line of the signature. Making due allowance for proponents' argument that exact similarity of signatures may sometimes be enough, in itself, to establish forgery, the result of these and other differences that might be pointed out is to give the disputed signatures an appearance seemingly characteristically different from that presented by those admittedly genuine, and mention of the above details will suffice to show the doubt that may properly be held to be thrown by the exhibits themselves upon the genuineness of the signature found on the contested will.

A further issue of the case involves the question of typewriting. The contention of proponents is that the contested will was written upon a Remington No. 6 typewriter. Contestants contend that it was written upon a Remington No. 10, which did not come to the market until some four years after the date which the instrument bears. In support of their contention proponents introduced the testimony of J. H. Billington and M. E. Roberts. Billington testified that he had been in the typewriter business for thirty-two years; that he had been engaged in selling and repairing the Remington since 1905 and that the contested will was

written upon a Remington No. 6. Witness mentioned a number of reasons for such conclusion, referring, in connection with his testimony, to various exhibits made upon No. 6 and No. 10 machines and identifying various characteristics which tended to support his opinion. He testified that on the No. 6 the capital "O" was used as a cipher, making it necessary to shift to make such numeral, and that there would be a tendency for such numeral to fall below the balancing line. Billington also testified that either long or short parentheses could be had for either machine, and that the manner of operation of the machine had something to do with the lengths of parentheses as impressed on the paper. Referring to commas, he testified that those on No. 6 machines usually showed more distinctly and with a tail, whereas those on No. 10 machines were always becoming battered. Roberts testified that he had been connected with the Remington Company for twelve years, during six of which he was, manager of district branches and then became manager of the Chicago branch; that he had visited the factory many times and watched the making of the type; that his first impression had been that the contested will was written upon a No. 6, and he had confirmed this by having a copy made upon a No. 6 and making comparisons with a mimeoscope; that the distribution of ink is more even on the No. 6 than on the No. 10 because the ribbon is flat and not vertical; that the condition of the ribbon and the manner of operation affect the length and breadth of the outline of characters on the paper; that on the No. 6 the capital "O" was used as a cipher, and that in shifting to make it there would be a tendency for the numeral to fall below the line, and that in the history of the Remington type as he knew it there was no such thing as shortening the length of the comma a fiftieth of an inch or lengthening the parentheses a hundredth of an inch. In connection with their testimony both Billington and Roberts referred to the contested will and to various exhibits which tended to support

their conclusions and which have been certified with the record. In their argument proponents call attention to these exhibits, and point out particularly that certain numeral "O's" in the will are depressed and that the ink of the letters is evenly distributed throughout.

On the question of typewriting, contestants offered the testimony of Jay F. Wood, the above mentioned witness who testified on the question of handwriting, who testified that he had operated typewriters since 1880; that he had been an official court reporter and a student of type form in typewriting for twenty-five years; that he had visited and spent time at every one of the large factories which manufacture typewriters and had done research work along all matters relating to manufacture and identification of type; that he maintained a laboratory; that the contested will was written on a No. 10 Remington; that the first commercial machine after the No. 6 was the No. 10; that the type of No. 10 was made from the same matrices as the No. 6, except the parentheses, commas and semicolons; that for the No. 10 a fiftieth of an inch was added to the parentheses and one one-hundredth of an inch was cut from the tails of the commas and semicolon; that the contested will has the parentheses and commas of a No. 10 machine. In connection with his testimony witness referred to various exhibits in the way of photographs which tended to bear out his opinion, among them being portions of the contested will in much enlarged form. These exhibits have been certified and are in the record. Contestants call attention to these exhibits in connection with this testimony, and also point out an apparent difference in the shape of the capital "O" and the numeral "o" as found in the purported will, emphasizing the testimony of proponents' experts that on a No. 6 machine these characters would have been made by the same type.

Caroline Beach Herr testified for contestants that she is a daughter of H. P. Beach, who died in 1910; that her

father was county judge of Ford county from 1873 to 1886 and after that practiced law; that she was secretary in his office; that her father was on friendly relations with Judge Moffett and received letters from him; that her father did not use a typewriter and no typewriter was used in his office in preparing legal papers. E. Hoobler testified for contestants that he was president of the Livingston County Abstract Company and had previously held the position of circuit clerk of Livingston county for eight years; that he knew Judge Moffett, of Ford county, who was a judge of that circuit, and that he spelled his name "Moffett." In this connection contestants call attention to the fact that in the contested will, claimed to have been written by Judge Beach, the name of Judge Moffett is spelled "Moffitt."

Proponents contend that for this court to uphold the verdict rendered would be to establish a dangerous precedent by way of allowing the testimony of professional experts to set at naught the direct testimony of witnesses testifying from actual knowledge. However, that proponents themselves do not regard the verdict rendered as having been based altogether on the expert testimony referred to is shown by the position taken at the close of their argument. They there insist that there are two elements in this case which make it impossible for them to get a fair trial by jury, one of which is found in the history of the disappearance and appearance of the will, with the mystery of the unknown Gerald Morrow, and the other being the provision of the will awarding to Judge Beach the property of anyone contesting it, and they therefore urge this court, on the authority of *Crumbaugh* v. *Owen,* 238 Ill. 497, to reverse without remanding. The state of the present issues and proofs is entirely different from that found in the *Crumbaugh case,* and it is clear that no such disposition of the cause as was there made would be in order here. The jury in the present case had to determine whether the contested will was the last will and testament of Amaretta Oliver and

whether it bore the genuine signature of Amaretta. The evidence was conflicting. In addition to the testimony of experts on both sides, they had before them exhibits tending to show that the contested will was written upon a typewriter which was not in existence at the date which the instrument bore, and exhibits from which the above-mentioned and other characteristic differences in handwriting were apparent. These handwriting exhibits tended to establish that there were rather marked characteristic similarities between the signatures of Amaretta Oliver as found on the contested will and in the Bible which came to light in the manner above indicated, but that the same nature and degree of similarity did not obtain as between the signatures on the contested will and in the Bible and signatures which were admittedly genuine. The jury also had before them in connection with the history of the document the circumstances as to its appearance, outlined in *Oliver* v. *Oliver, supra.* True, they had before them the testimony of the attesting witnesses and witness Megquier, and this testimony was not directly impeached, but a court or jury is not bound to adopt the statements of a witness simply for the reasons that no other witness has directly denied them and that the character of the witness is not impeached. The witness may be contradicted by circumstances as well as by statements of others contrary to his own, or there may be such a degree of improbability in his statements as to deprive them of credit, however positively made. (*Koehler* v. *Adler,* 78 N. Y. 287.) The subscribing witnesses to a will are not to be regarded as more or less truthful than other witnesses because they are subscribing witnesses. (*Valentine* v. *Second Baptist Church,* 293 Ill. 71.) The testimony of such witnesses may be overcome by any competent evidence, and other evidence, circumstantial as well as direct, may tend as effectually to impeach and discredit the evidence of attesting witnesses as would the formal presentation of witnesses who would avow that the attesting witnesses had

bad reputations for truth and veracity. (*Baird* v. *Shaffer,* 101 Kan. 585, 168 Pac. 836; *In re O'Connor,* 105 Neb. 88, 179 N. W. 401.) Where the testimony is conflicting and the verdict of the jury in a contested will case is not clearly against the weight of the evidence the finding of the jury must be regarded as conclusive. (*Turckheim* v. *Birkley,* 287 Ill. 434; *Hurley* v. *Caldwell,* 244 id. 448.) The present case has been tried before two juries, each of which found against the will, and in such cases reviewing courts are more reluctant to reverse than where there has been only one verdict. (*Blackhurst* v. *James,* 304 Ill. 586.) Taking into consideration everything disclosed by the record, we are of the opinion that we would not be warranted in disturbing the verdict here.

Proponents contend that error was committed in refusing to give a certain instruction bearing upon the burden of proof. In the light of the principles laid down in *Sellers* v. *Kincaid,* 303 Ill. 216, and *Grosh* v. *Acom,* 325 id. 474, this contention is not well taken. Nor is there merit in proponents' claim that error was committed in refusing to give another instruction setting forth certain contingencies and directing the jury to find the issues for proponents in the event that these contingencies were deemed to have been established by a preponderance of the evidence. Aside from the question as to the correctness of the rule of law stated in this refused instruction, we are of the opinion that the jury were otherwise amply instructed with respect to the ground sought to be covered thereby.

The decree of the circuit court of Livingston county is affirmed.

Per CURIAM: The foregoing opinion reported by Mr. Commissioner Edmunds is hereby adopted as the opinion of the court, and judgment is entered in accordance therewith.

*Decree affirmed.*