The First National Bank of Chicago, Plaintiff-Appellee, v. Abberlae Rovell, Continental Illinois National Bank and Trust Company of Chicago, Conservator of the Estate of Joseph L. Apfelbaum, Incompetent, American National Bank and Trust Company of Chicago, Administrator of the Estate of Ida S. Krelof, Deceased, Defendants-Appellees, Paul Apfelbaum, Intervenor-Appellant.

Gen. No. 49,325.

First District, Second Division.

August 14, 1964.

Crowley, Sprecher, Barrett & Karaba, of Chicago (Robert A. Sprecher, of counsel), for appellant.

H. Reed Harris and Bernard Puckowitz, both of Chicago (H. Reed Harris, of counsel), for appellee.

MR. JUSTICE BRYANT delivered the opinion of the court:

This is an appeal from a decree of the Circuit Court of Cook County entered on June 19, 1963, ordering among other things that $7566.45, being the proceeds of First National Bank checking account number 20–5203–2, be paid to defendant Abberlae Rovell, the

stepdaughter of Ida S. Krelof, deceased. The case was filed by the First National Bank as interpleader to determine the proper disposition of certain funds held in a joint checking account by Abberlae Rovell and Ida S. Krelof, deceased, and certain funds held jointly in a savings account by Ida S. Krelof, deceased and Joseph Apfelbaum, incompetent (later deceased). This appeal is brought by Paul Apfelbaum, the brother of Ida S. Krelof and Joseph Apfelbaum, as intervenor, to protect his rights as a residuary legatee under the will of Ida S. Krelof and a possible beneficiary of the estate of Joseph L. Apfelbaum, deceased.

The only question for determination is whether certain bank withdrawal slips purportedly signed by Ida S. Krelof while she was hospitalized in her last illness were genuine. The lower court found that the signatures were genuine.

Ida S. Krelof was admitted to Bethesda Hospital in Chicago on July 17, 1960, with a heart condition referred to as Adam's-Strokes which is characterized by heart convulsions. She was eighty-five years of age at the time. During her stay in the hospital Mrs. Krelof had periods of serious illness and of relative well being. She received intravenous feedings, oxygen and electrocardiograms on occasion during her stay. The disputed bank withdrawal slips were signed on August 1, August 15, and August 22. Mrs Krelof died suddenly on August 23, the day she was scheduled to leave the hospital.

A recognized handwriting expert, called by Paul Apfelbaum, compared the three disputed signatures with four admittedly genuine signatures. These signatures were written in 1938, 1943, July of 1960, and July 20, 1960, while Mrs. Krelof was hospitalized. The expert testified that he believed the three disputed signatures were imitated from an earlier example of the known specimens of Ida Krelof. The style of

283

writing was different than the known specimens. There was evidence of care in the signatures which was inconsistent with infirmity. It was his positive opinion that the disputed signatures were not written by Mrs. Krelof. On cross-examination he pointed out that physical conditions—aging, senility and sickness—have a good deal to do with writing. Oxygen and drugs can affect a person's handwriting. The size of the table, mental condition, pain, would all affect a writing.

The appellees offered no handwriting expert. A nurse, Florence Babbin, testified that she was present on July 20, August 1, August 15 and August 22, when Mrs. Krelof signed the withdrawal slips. Mrs. Krelof had asked her to come in when she signed them, that she was getting better, was able to move around and talk on August 22 and was in much better condition than when she came into the hospital. Miss Babbin testified that she saw Mrs. Krelof sign her name to these three withdrawal slips in her own hand.

Abberlae Rovell was called as a witness and testified that she saw her stepmother sign withdrawal slips on July 20, August 1, August 15 and August 22. Mrs. Krelof had lived with Abberlae Rovell for the last fifteen years of her life. Mrs. Krelof's hospital bills were paid by Abberlae Rovell. She testified that the signature of July 20 was very poor because her stepmother was in bed at the time and was being fed intravenously through the arm. When the disputed signatures were signed she testfied that her stepmother was up. She also testified that Mrs. Krelof was ambidextrous and that she did not know with which hand the signatures were made.

There were minor discrepancies between the testimony of Abberlae Rovell and Florence Babbin. Donald Tyrrill, chief accountant at the hospital, was brought in to impeach Miss Babbin's testimony. The

most he was able to do from the hospital records was to a raise a question whether Miss Babbin was in the Hospital on August 22. The court viewed the case as a question of credibility and found for Abberlae Rovell. The appellees maintain that this determination is against the manifest weight of the testimony.

The question to be determined is whether the testimony of a handwriting expert should be taken as true over the direct observation of two occurrence witnesses. We are not called upon to weigh the merits of expert testimony as opposed to lay testimony based on a comparison with known specimens of the deceased's writings. Those cases and articles cited in appellant's brief are not in point and will not be commented upon. The traditional rule has been set out in an annotation in 154 ALR 649, 651–652:

> "Conceding that the testimony of handwriting experts is entitled to the same weight as other similar evidence, and that it must be considered in the light of all the facts and circumstances, nevertheless, it may be laid down as a general rule that the positive testimony of unimpeached attesting witnesses is not outweighed by, and is more convincing than, the testimony of handwriting experts who express opinions only."

In Jones v. Jones, 406 Ill 448, 449–450, 94 NE2d 314 (1950) the court stated:

> ". . . The testimony of these witnesses produced in this case before the court was direct and a positive statement of fact that the deceased had signed her name and executed the will. The other point to be kept in the foreground is that the testimony of experts is, at the best, *secondary evidence, merely an opinion* as opposed to a positive fact, and however expert the witness may be, he

285

is not giving voice to any direct statement of fact capable of proof, but only the opinion of what he thinks the alleged differences in the signatures disclose."

And at 451:

"As pointed out above, the testimony of the experts is nothing but an opinion, which may be useful when it can be corroborated by definite facts, or when it is connected with facts which may be substantiated, but it cannot be allowed to prevail over the uncontradicted and unimpeached testimony of two disinterested witnesses, who testified they saw the testatrix write the signature in question. The opinion of the experts, whether well- or ill-founded, does not subject them to the penalties of perjury, if false, while, on the other hand, the testimony of the attesting witnesses may, in case of falsehood, subject them to such penalties."

The Jones case has been criticized in McCormick on Evidence, § 173, n 15, p 368 (1954), because it sets down a general rule of priority apparently without consideration of the surrounding facts. Another statement of the Illinois position was made in Oliver v. Oliver, 340 Ill 445, 460–461, 172 NE 917 (1930) where the court stated:

"These handwriting exhibits tended to establish that there were rather marked characteristic similarities between the signatures of Amaretta Oliver as found on the contested will and in the Bible which came to light in the manner above indicated, but that the same nature and degree of similarity did not obtain as between the signatures on the contested will and in the Bible and signatures which were admittedly genuine. . . .

286

True, they (the jury) had before them the testimony of the attesting witnesses and witness Megguier, and this testimony was not directly impeached, but a court or jury is not bound to adopt the statements of a witness simply for the reasons that no other witness has directly denied them and that the character of the witness is not impeached. The witness may be contradicted by circumstances as well as by statements of others contrary to his own, or there may be such a degree of improbability in his statements as to deprive them of credit, however positively made . . . . The testimony of such witnesses may be overcome by any competent evidence, and other evidence, circumstantial as well as direct, may tend as effectually to impeach and discredit the evidence of attesting witnesses as would the formal presentation of witnesses who would avow that the attesting witnesses had bad reputations for truth and veracity . . . ."

The annotation in 154 ALR 649, 652–653 recognizes that the testimony of handwriting experts, if corroborated by other facts or circumstances, is legally sufficient to overcome the testimony of those claiming to be subscribing witnesses. It should be observed that in the Oliver case, however, there were three independent circumstantial factors that bore on the invalidity of the testator's signature: 1. the will had unaccountably disappeared; 2. there was a provision in the will leaving to the attorney who drew the will the property given to any party under the will who might choose to contest the will; 3. expert testimony had been introduced to show that the purported will had been typed on a typewriter which was not in existence on the date on which the instrument was signed. See also Yowell v. Hunter, 403 Ill 202, 214–216,

85 NE2d 674 (1949); In re Estate of Rollins, 6 Ill App2d 283, 127 NE2d 269 (1955).

Whichever rule we apply to the facts of this case it is clear that the testimony of the positive eye-witnesses was not overcome by the testimony of the handwriting expert nor were they effectively impeached. Florence Babbin is a completely disinterested witness who positively testified that she witnessed the disputed signatures. The attempted impeachment of her by the hospital accountant was not particularly effective. The testimony of Abberlae Rovell was direct and largely corroborative of Florence Babbin's story. Abberlae Rovell is an interested witness who could have been prevented from giving testimony under the Dead Man's Act. She was allowed to testify.

There were no other circumstances which weighed on the side of the handwriting expert. Abberlae Rovell had cared for the deceased for the last fifteen years of her life; was her stepdaughter; had paid her bills; and was the natural object of her affection. It is true that she is an interested party, but she was allowed to testify without objection. The fact that appellee produced no handwriting expert has no bearing on her credibility and does not raise any negative inference regarding the genuineness of the signatures.

We believe that the court properly viewed the case as a question of credibility and that its determination was not against the manifest weight of the evidence. The handwriting expert in this case outlined a great multitude of factors that would bear on the authenticity of a signature. The court clearly was not mistaken in preferring the direct testimony of the eyewitnesses rather than an opinion based on this multitude of factors.

Judgment affirmed.

BURKE, P. J. and FRIEND, J., concur.