**In the Matter of the ESTATE OF Harry G. NICOLAUS, Deceased.**

No. 84-458.

Supreme Court of Iowa.

April 17, 1985.

J.L. Kuehnle, Mechanicsville, and David A. Elderkin of Elderkin, Pirnie, Von Lackum & Elderkin, Cedar Rapids, for appellant Sheryl L. Nicolaus.

Jon R. Pearce and Mark R. Gillett of Stanley, Lande, Coulter & Pearce, Muscatine, for appellee trustee.

Considered by UHLENHOPP, P.J., and McCORMICK, SCHULTZ, CARTER, and WOLLE, JJ.

UHLENHOPP, Justice.

This appeal involves construction of the term "issue" in a will.

Testator Harry G. Nicolaus was a successful banker and a man of means in Wilton, Iowa. He and his wife Edith had two children, Harold G. and Robert H. Nicolaus. As adults, both sons worked in the bank until a later time when Robert took over the bank's insurance business; he thereafter operated that business in the same building. The Nicolauses were a closely-knit family.

Harold and his wife Grayce had two children, Theresa A. and George R. Nicolaus. In 1951 Robert married Helen Arp, the daughter of Mr. and Mrs. Fred Bohnsack. Helen had been married before and was divorced. The divorce estranged Helen's parents from her, and she did not inherit from them. Helen had custody of a daughter from her first marriage, Sheryl L. Arp, born in 1946, whom she brought into her marriage with Robert. From the beginning Sheryl was taken in by the entire Nicolaus clan as one of the family.

Although Sheryl used the name Nicolaus, Robert did not immediately adopt her. Helen testified regarding adoption proceedings:

I don't remember the exact date that preliminary action was started. I know [Robert] talked to an attorney very shortly after we were married regarding it, but Sherry's natural father was still living. And as I recall the incident, the attorney felt that it would be better to wait. He was defaulting—Sherry's father was defaulting in either his monthly payments or in the insurance policies that in the petition he agreed to keep up for Sherry's education. And my recollection of it is that the attorney felt that it would be much easier to effect the adoption if they waited until he defaulted on those things. And that's to the best of my recollection.

In 1953 Robert and Helen had a son, Robert H. Nicolaus II (called "Nicky").

Testator drafted legal instruments of various kinds for bank customers. In 1956 he drafted and typed his own will consisting of eighteen paragraphs on three and one-half pages. The will named Edith as executrix and contained a residuary trust with the net income to go to Edith as long as she lived and this remainder clause:

> Upon the death of my said wife, Edith I. Nicolaus, said trust shall immediately terminate, and thereupon the assets of said trust, together with any undistributed income therefrom, shall be divided equally between our two sons, Harold G. Nicolaus and Robert H. Nicolaus, share and share alike. Should either of said sons be deceased at the date of the termination of said trust leaving issue surviving, I direct that the share which would have gone to the one so deceased shall go to such issue, to be divided equally between them, should there be no child surviving, but should either of our said sons be deceased at the date of the termination of said trust, leaving no issue surviving, I direct that the share of the one so deceased shall go to the survivor of said sons.

Testator named the Wilton Savings Bank as trustee.

About five months after executing the will, testator died, survived by all the members of the family we have named. His will was admitted to probate and the residuary trust went into operation.

In 1959 Robert adopted Sheryl; she was then thirteen years old.

In 1975 Robert died, survived by Helen, Sheryl, and Robert II.

In 1977 Robert II died, unmarried and childless.

In 1982 Edith died. At that time testator's son Harold was alive but testator's son Robert was deceased, and Robert's only surviving child was his adopted daughter Sheryl. Harold claims that under the will Sheryl is not "issue" of Robert, so that he, Harold, takes the whole remainder of the trust. Sheryl claims that she is Robert's "issue" so that Harold and she divide the remainder.

The trustee brought this declaratory judgment action to resolve the question. After trial, the court held that Harold takes the whole remainder. Sheryl appealed. We review do novo. *Russell v. Johnston*, 327 N.W.2d 226, 228 (Iowa 1982).

The question, of course, is whether Sheryl takes as "issue". The question may be broken down into two parts. First, is Sheryl "issue" *as to her adoptive father Robert?* That is, if Robert had left a will giving his own property to his issue, would Sheryl have taken? If so, then second, is Sheryl "issue" of Robert *as to testator Harry G. Nicolaus?* That is, under the clause of the will of Harry G. Nicolaus giving part of the remainder to Robert's issue, does Sheryl take?

■ I. At the time testator made his will our statute provided in section 633.223 of the Iowa Code of 1954:

> Upon the entering of such [adoption] decree, the rights, duties, and relationships between the child and parent by adoption shall be the same that exist between parents and child by lawful birth and the right of inheritance from each other shall be the same as between parent and child born in lawful wedlock.

At the time of Edith's death, the statute provided in section 633.223 of the 1981 Code:

> A lawfully adopted person and his heirs shall inherit from and through the adoptive parents the same as a natural born child....

Under similar statutes several courts have stated that as between the adopter and the adoptee, the latter is the "issue" of the former, and we so hold in the absence of language in the will, not present here, showing an intent to limit "issue" to biological descendants. *Southside Baptist Church v. Drennen,* 362 So.2d 854 (Ala. 1978); *In re Heard's Estate,* 49 Cal.2d 514, 319 P.2d 637 (1957); *Wilmington Trust Co. v. Chichester,* 369 A.2d 701 (Del.Ch. 1976), 377 A.2d 11 (Del.1977); *Wilmington Trust Co. v. Haskell,* 282 A.2d 636 (Del.Ch. 1971); *Breckinridge v. Skillman's Trustee,* 330 S.W.2d 726 (Ky.1959); *In re Holden's Trust,* 207 Minn. 211, 291 N.W. 104 (1940); *In re Bowen's Estate,* 66 Misc.2d 122, 320 N.Y.S.2d 186 (1971); *Graves v. Graves,* 79 Ohio App. 262, 155 N.E.2d 540 (1956); *Dollar Savings & Trust Co. v. Musto,* 88 O.L.A. 62, 181 N.E.2d 734 (App. 1961). *But see Campbell v. Musart Society of the Cleveland Museum of Art,* 72 Ohio App. 46, 131 N.E.2d 279 (1956) (language of particular statute deprived adoptee of right to take). If the present gift to "issue" had been in will of Robert, Sheryl would have taken as Robert's issue.

II. The other part of the question is whether the result is different because the gift was in the will of a stranger to the adoption, Harry G. Nicolaus. This court formerly applied the stranger to the adoption rule, which severely restricted the scope of clauses in wills and grants with respect to children adopted by others. *Schaefer v. Merchants National Bank,* 160 N.W.2d 318 (Iowa 1968); *Cook v. Underwood,* 209 Iowa 641, 228 N.W. 629 (1930); *Warden v. Overman,* 155 Iowa 1, 135 N.W. 649 (1912). We subsequently reversed the presumption and overturned those decisions in *Elliott v. Hiddleson,* 303 N.W.2d 140 (Iowa 1981). *See also In re*

*Wright's Estate,* 241 Iowa 349, 41 N.W.2d 80 (1950).

*Elliott* involved a life estate followed by a gift to grandchildren or their "lineal heirs at law." *Id.* at 142. The question was whether adopted grandchildren took. After discussing *Schaefer, Cook,* and *Warden* we stated:

> However, we now reject the stranger to the adoption rule.

> In accordance with the policy favoring adoption recognized in *Schaefer,* the majority of jurisdictions which have confronted the issue in recent years have rejected the rule. Some decisions have been based on statutes which have been held to dictate that result. Other decisions rejecting the rule have been based on the policy expressed in statutes like our own which simply give an adopted child the legal status of a natural child of the adopting parents. Because we are dealing with a rule of construction, we are free to change it by judicial decision.

> In a similar situation, the Supreme Court of New Jersey reasoned:

> "At any rate, it is not important whether the adoption statute directly controls the interpretation of instruments. The important point is that the statute reflects the feeling and attitude of the average man and hence its policy should be followed unless the benefactor explicitly reveals a contrary purpose....

> "...

> "We cannot believe it probable that strangers to the adoption would differentiate between the natural child and the adopted child of another. Rather we believe it more likely that they accept the relationships established by the parent whether the bond be natural or by adoption and seek to advance those relationships precisely as that parent would. None of us discriminates among children of a relative or friend upon a biological basis.... We ought not to impute to others instincts contrary to our own." [*In re*] *Coe,* 42 N.J. [485,] at 489–92, 201 A.2d [571,] at 574–75 [1964]. We join the states which have rejected the stranger

to the adoption rule. Consequently we overrule prior cases which have relied on it.

*Id.* at 144 (citations omitted).

 Testator died in 1956 and *Elliott* was decided in 1981. Court decisions, however, normally operate retrospectively as well as prospectively, unless they are "Sunbursted", that is, they announce that they operate prospectively only. *Beeck v. S.R. Smith Co.*, 359 N.W.2d 482, 484 (Iowa 1984). Nothing in *Elliott* indicates that it is restricted to prospective operation. It therefore governs testator's will.

 III. When we rejected the stranger to the adoption rule in *Elliott*, however, we laid down two qualifications. If adoption is consciously used to frustrate a testator's normal expectations, *Elliott* will not be applied. *Elliott*, at 144–45 ("we will not permit the conscious use of adoption as a means of upsetting a transferor's normal expectations"). Nothing in this case suggests such a use of adoption. The evidence shows an intent by Robert, before he and Helen married and before testator made his will, to adopt Sheryl. Evidently complications intervened, and the adoption was not accomplished until later. It was achieved, however, when Sheryl was but thirteen years old. We find nothing in the record to suggest that Robert and Helen consciously used adoption to upset testator's plans. On the contrary, the adoption appears to have resulted from Robert's normal and commendable desire to have Sheryl be his own child.

The other qualification is that a testator retains the right to distinguish between natural and adopted children as his beneficiaries. We stated:

In rejecting the [stranger to the adoption] rule, we do not preclude the right of a testator to distinguish between natural and adopted children as objects of his bounty. We merely require that such intent be shown. Unless a contrary intent appears, we will presume that a testator intended to treat adopted children in the same manner as natural children.

*Id.* at 144. Thus we have held that by a gift to the heirs "of her body", a grantor has indicated an intent to exclude an heir by adoption; adopted children are not of the "body", and we cannot ignore the express language employed by the grantor. *Skoog v. Fredell*, 332 N.W.2d 333 (Iowa 1983). *See also Bladt v. Bladt*, 191 Iowa 1344, 181 N.W. 765 (1921).

While acknowledging that *Elliott* rejected the stranger to the adoption rule, Harold contends that the circumstances here demonstrate "a contrary intent" within the second *Elliott* qualification. One of the circumstances relates to three monetary bequests in the will. When testator made the will in 1956, he had three grandchildren: Theresa, George, and Robert II. Sheryl lived with Robert and Helen, but she had not been adopted. She was not a child or heir of Robert nor a grandchild or heir of testator. In paragraphs 4, 5, and 6 of the will testator gave $5000 to "my Granddaughter, Theresa", $5000 to "my Grand-son, George", and $5000 to "my Grand-son Robert II". He did not make a similar bequest to Sheryl (although the record shows that Edith as executrix paid such bequests to both Robert II and Sheryl in the form of stocks).

We do not find this circumstance to be sufficient to establish a "contrary intent" within the *Elliott* qualification. Sheryl had not then been adopted; she was not Robert's daughter. Testator would know, however, that between the time of his death and Edith's death a number of changes in the family were possible, births, adoptions, deaths. He did not designate by name the individuals who would take at Edith's death if Harold or Robert did not survive Edith; he used the term issue. The identity of that issue would be ascertained at Edith's death, was subject to change until then, and could not be known beforehand. *Smith v. Harris*, 227 Iowa 127, 287 N.W. 255 (1939). Testator must have known that the makeup of the class would be determined at that later date, and that the class might consist of all or some who were his

grandchildren living in 1956, might include none of them, and might include others.

Another circumstance Harold relies on relates to a conversation he testifies he had with testator concerning the will. We preface that testimony with a letter Harold wrote.

In 1977 Robert II (Nicky) died, and Sheryl was executor of his will. Her attorney wrote Harold inquiring whether Nicky had an interest in the Harry G. Nicolaus trust which should be included in Nicky's estate. Harold responded by mail directly to Sheryl, and stated in part:

> Finally, and in response to Attorney Crawford's request on behalf of Nicky's estate and in regard to the Harry G. Nicolaus trust, I believe the following is applicable. Mother has the income from this trust during her lifetime. Upon mother's death, the trust proceeds were envisioned as going to Nicky's father and me. Due to deaths, legal counsel informs me that *if mother passed on as of now, you would inherit my brother's share* and further, the trust and Nicky's estate are not inter-related. Also, the trust specifically exempts the trustee having to file periodic reports to any court.

(Emphasis added.) At trial, Harold was unable to identify "legal counsel" mentioned in the letter, did not bring forth such counsel, and testified he did not agree with the legal advice—although he reported it without expressing disagreement in the letter to the potential beneficiary.

Harold's testimony in the 1983 trial contains the following (objections, arguments, and rulings omitted):

Q. Calling your attention to early 1956, was it your custom to walk home at the end of the day from the bank with your dad? A. With regularity, yes.

Q. Do you recall on one of those occasions when you and your dad had a conversation concerning a Will? A. Yes, sir.

Q. And approximately at what point in time did this conversation take place? By that I mean, what time of the year

was it, or what month? A. My recollection is that it was in February of 1956.

Q. And what time of the day did this conversation take place? A. Between 5 and 5:30.

Q. And where did the conversation take place? A. In the parlor of his home.

Q. Now, in Wilton, how far was your dad's home from your home? A. 300 yards.

Q. How did you happen to be in your dad's home on that particular day? A. He asked me to stop in.

Q. Had you walked home together? A. We had.

Q. And was it while you were on your way home that he asked you to stop in? A. Yes, sir.

Q. When your dad invited you into the house, were you two walking along on the sidewalk there? A. I think probably as we approached the front of his house, he said, "Will you step in with me for a little while?"

Q. And did you then go into your dad's house? A. Yes, sir.

Q. Was anyone else present at the time? A. He and I in the front of the house alone.

Q. And what room is that? A. Parlor.

Q. And was there a conversation, then, that the two of you had at that time? A. Yes, sir.

Q. And tell me who said what at that time.

. . .

A. After we were in his home, he said, "I would like you to see a copy of my proposed Will."

Q. And what did you do or say in response to that?

. . .

A. I read the Will while we were there together.

Q. Did you take some time, then, to read over the Will? A. Yes, sir.

Q. How much time did you take to read it over; do you recall? A. I would estimate ten minutes.

Q. And where were you while you were doing this? A. I was seated in one of the chairs in the parlor.

Q. Where was your dad? A. In another chair in the parlor.

Q. And after you finished reading the Will, did you have any conversation with your dad at that time? A. Yes, sir.

. . .

Q. In reading the Will, did you notice any provisions in it concerning specific bequests to your children? A. Yes, sir.

Q. And did you notice any specific bequests to Nicky? A. Yes, sir.

Q. And did you notice any specific bequests to Sheryl? A. No, sir.

Q. What were the specific bequests in the Will to Terry, to George, and to Nicky? a. They were to receive $5,000 each from the corpus of the estate.

Q. Was there any specific bequest whatsoever to Sherry? A. None.

Q. Was there a trust that was established by the Will? A. Yes, sir.

Q. And when you read the Will, did you read how the terms of the Will provided for that trust to be ultimately distributed upon the death of your mother, Edith? A. Yes, sir.

A. And what, if anything, did you notice about those provisions in terms of describing the people who would take the residue of the trust upon your mother's death?

. . .

A. I noticed that my brother and I were named specifically, or the survivor, as I understood the terms of the Will.

Q. And what if there was no survivor as between one of you, you and your brother? A. I thought the other would receive in the entirety.

Q. The surviving brother would receive the entire interest subject to any children?

. . .

A. I don't know that this will answer your question, Jon, but I thought it would be a trickle down, you know, whoever survived in the family chain would be the recipient of the proceeds of the trust.

Q. Okay. Call your attention specifically to paragraph 5 of item 8 of the Will, this paragraph here, and ask you to take a look at that, if you would. A. Yes.

Q. Okay. Now, when you read the Will, what was your understanding as to what would happen to the trust property upon the death of your mother? To whom would it go?

. . .

A. I was under the impression that upon the death of my mother, it would go to my brother, Robert, and I if we were living at that time.

Q. And if one of you was not living to whom would that brother's share go?

. . .

A. The survivor of the two brothers.

Q. Does that paragraph that I pointed out to use the word issue? A. Yes, sir.

Q. And did you read that word when you read the Will the first time? A. Absolutely.

Q. In your reading of the Will, how does it use the term issue?

. . .

A. I looked upon the word issue as meaning what I have since heard as biological family. They were coterminous, as far as I am concerned.

Q. And in your mind, did the word issue have some relationship to what would happen if either you or Robert were dead when your mother was passed away? A. Oh, yes.

Q. And of what significance was that to you as you read the Will?

. . .

A. I felt that if I had predeceased my brother, he would receive the residue of the trust, and vice versa.

Q. What if you died leaving issue?
A. No, I think it would have gone to my brother.

Q. After you read the Will, then, did you have a conversation with your dad?
A. Yes, sir.

Q. And tell us what was said in that conversation.

. . .

A. I said to my father, "Sheryl's name does not appear in those who are to receive a $5,000 bequest." And he said, "I know that." He went on and said "Fred Bohnsack is a well-to-do person, and he can look after his family, and I will continue to look after my family."

■ Preliminarily, an evidentiary problem arises concerning this testimony: whether it is admissible at all in view of the parol evidence rule—endeavoring to show by testator's parol utterances that he did not intend to include Sheryl in the will. *See In the Matter of the Estate of Anderson,* 359 N.W.2d 479 (Iowa 1984). Putting that problem aside, the basic question relates to the weight and value of the quoted testimony. In determining credibility, financial interest is a consideration, and the witness Harold had many thousands of dollars at stake. Another consideration is Harold's previous letter reciting the opinion of his unnamed attorney contrary to Harold's present position—without any disagreement expressed by Harold. Still another factor is Harold's silence about the parlor incident over the years, and his recitation of it after testator and all of the principals, who might have shed light by testimony, were deceased. Entirely separate from the dead man's statute (now itself deceased), this court has long applied the rule that testimony of claimed conversations with a person since deceased should be scrutinized with care, for the very practical reason that the decedent is unable to relate his version or perhaps testify as to the nonexistence at all of such a conversation. The survivor therefore has no fear of contradiction. As stated in *First Trust Joint Stock Land Bank v. McNeff,* 220 Iowa 1225, 1231, 264 N.W. 105, 108 (1935):

Where a witness testifies concerning a fact not capable of being denied because the lips of all persons who might deny the same are sealed in death, such testimony should be scrutinized jealously and weighed cautiously, and its credibility subjected to the most severe tests. *Bohen v. North American Life Insurance Co. of Chicago,* 188 Iowa, 1349, 177 N.W. 706.

As stated in *Watson v. Richardson,* 110 Iowa, 673, at page 678, 80 N.W. 407, 409:

"Much of the testimony is not subject to direct contradiction. * * * Such testimony must necessarily be tested by its own inherent probability or improbability, by comparison with the other evidence in the case, and by the ordinary rules of human conduct under similar circumstances. * * * From the nature of the evidence given, it is not subject to any worldly sanction; it being obviously impossible that any witness should be convicted of perjury for speaking of what he remembers to have been said in a conversation with a deceased person."

And again in *Holmes v. Connable,* 111 Iowa, 298, at page 301, 82 N.W. 780, 781:

"The lips of the only two witnesses who could deny it are forever closed. The only person who could controvert the admissions alleged to have been made is the dead man against whose estate this claim is produced. There is no defense that can be made, save as it may be found in the improbability of the stories of the plaintiff's witnesses, when tested by comparison with other evidence in the case, or by the ordinary rules of human conduct under similar circumstances. * * [*Wallace v. Rappleye,* 103 Ill. 229, 241 (1882):] 'It is incumbent on the court to look upon such evidence with great jealousy, and to weigh it in the most scrupulous manner, to see what is the character and position of the witnesses generally, and whether they are corroborated to such an extent as to secure confidence that they are telling the truth.' "

Applying the principle, *see Kufer v. Carson*, 230 N.W.2d 500 (Iowa 1975); *Byers v. Byers*, 242 Iowa 391, 46 N.W.2d 800 (1951); *Evans v. Evans*, 230 Iowa 434, 297 N.W. 867 (1941); *Williams v. Harrison*, 228 Iowa 715, 293 N.W. 41 (1940); *In re Bremer's Estate*, 151 Iowa 449, 131 N.W. 667 (1911); *Boeck v. Milke*, 141 Iowa 713, 118 N.W. 874 (1908). Voicing similar views, *see Wustum v. Kradwell*, 270 F. 546 (7th Cir. 1920); *In re Seaman*, 27 F.Supp. 760 (E.D. Mo.1939); *First National Bank v. Rovell*, 51 Ill.App.2d 282, 201 N.E.2d 140 (1964); *In re Maijgren's Estate*, 193 Misc. 814, 84 N.Y.S.2d 664 (1948); *Wargo v. Wargo*, 48 Misc.2d 349, 265 N.Y.S.2d 37 (1965); *Heuer v. Heuer*, 7 Wis.2d 208, 96 N.W.2d 485 (1959).

Our basic disagreement with Harold in this case relates to the strength of the presumption "that a testator intended to treat adopted children in the same manner as natural children," and in the strength a counter-showing must possess to overcome that presumption and establish that a testator intended "to distinguish between natural and adopted children as objects of his bounty." *Elliott*, at 144. In our de novo review we are obliged to find the facts. Assuming without deciding that Harold's quoted testimony is admissible, and also that it generates a fact question as to whether testator intended to distinguish between natural and adopted issue, we find as a fact that such testimony is of insufficient weight and value to overcome the usual presumption the testator intended to treat an adopted child the same as a natural child. We do not imply that the result would be different if Harold's testimony were accepted at full value; we do not reach that question.

We have examined the other circumstances that Harold contends establish an intent to exclude the adopted child, but we find they do not rise to that level. We thus hold that Sheryl shares equally in the remainder with Harold.

REVERSED.