In the Matter of the Estate of Fred Ruebush, Deceased. Ernest Simpson, Appellant, v. Henry Ruebush, as Administrator, etc., Appellee.

Gen. No. 64-33.

Third District.

November 16, 1964.

George K. Meuth, of Cuba, for appellant.

T. Otis Brown, of Bushnell, for appellee.

SCHEINEMAN, J.

Ernest Simpson filed a claim against the Estate of Fred Ruebush, deceased, based on a promissory note for the face amount of $60,000, dated February 21, 1959. It contained a promise to pay "six months after date," but at the bottom it is stated, "due at death." This ambiguity was resolved by parole evidence that the note was intended to be due at death, but the estate was to have six months to arrange for settlement.

The trial judge disallowed the entire claim. On this appeal it is contended that the decision is contrary to

the manifest weight of the evidence, and it is our opinion that this contention is well founded. This necessitates an extensive recital of the testimony, thus producing a long opinion.

Since there were two persons who signed as witnesses to the signature of the deceased, counsel chose to permit the claimant to testify, without objection, so that he would be subjected to extensive cross examination.

He testified that he worked for Ruebush in 1952–1953 for $30 per week with house, garden, meat, and milk furnished, and part of the time Ruebush paid the electric bill.

He left Ruebush in 1953, moved to Macomb, and worked on a milk route at $110 per week. In 1955 he again worked for Ruebush and helped farm 700 or 800 acres, but continued to occupy his own home. He was paid $36 per week and was to receive a bonus of $5,000 at the end of the crop year. The bonus received was a note for $5,000.

He bought a house in Macomb for $7,500 on contract. By 1956 he had paid $2,700 on the principal and made improvements costing $4,300. This investment of $7,000 was traded as a down payment on a farm with a balance due of $14,200. He also gave a note for $1,000 for personal property. He had paid off this note by 1958 and had paid $250 semiannually on the farm. He had also obtained loans at a bank and a finance company.

In January, 1958 Ruebush asked him to come back and farm on shares and to give up his farm contract. As a result, he assigned the contract to one Stimson for nothing. He also sold some personal property to Stimson for $1,175. He had acquired some livestock and machinery at farm sales and had the increase of the livestock, most of which he turned over to Ruebush

56

at fixed prices agreed to by Ruebush. The valuation placed on the livestock was $9,225, and on the machinery, $2,650.

Ruebush gave him a note for $37,500 to pay for the livestock and machinery, also $5,000 for the previous note which was now returned, also $4,000 as his bonus for 1956, not previously paid, and the balance was to compensate him for the loss he took on his farm. This "trade" was agreed to in January, 1958, and completed in April. In the meantime there had been further discussions with the result that the claimant did not farm on shares but continued to work for $36 per week and furnished his own house.

He delivered the livestock to a Ruebush farm, known as the James Place, and the machinery to the Camp Ellis farm. Thereafter he worked for Ruebush on the James Place, the Camp Ellis farm, and other Ruebush farms near Scitoa and Good Hope until after Ruebush died, and he was paid $36 per week.

Prior to the date of the present note, Ruebush wanted to buy a 205-acre farm at Camp Ellis, but he wanted Simpson to agree to work for him until after he died, and proposed to take up the $37,500 note and give him the $60,000 note, expressing the wish that Simpson might trade the note for the Camp Ellis farm after Ruebush died. Shortly prior to the date of the new note Ruebush did buy the farm, and it otherwise appears that Simpson had agreed to work for him the rest of his life.

On February 21, 1959, the two witnesses to this note were doing some work for Ruebush and had no personal interest in the transaction or any knowledge of it except what Ruebush told them at the time. In the presence of Simpson and one Rauch, Ruebush got the note out of his car, placed it on the hood, and wrote the name Ernest Simpson as payee. He then asked Rauch

to fill in the rest of the blanks, and the amount of $60,000, and said he hoped Simpson could get the place out of it when he died. After the note was completed, Ruebush signed and then the two witnesses signed, and the note was handed to Simpson. At some other time, he returned the prior note for $37,500.

From time to time Ruebush advanced some money to Simpson in addition to his weekly wage. Ruebush wanted this figured out and endorsed on the note as a payment of interest, so that if something happened to him there would not be any unsettled claims between them. The amount came to $2,775.05. They went to a bank in Table Grove, and Simpson asked a banker to make an endorsement. As he remembered it, Ruebush did not go up to the window, but he did look at the endorsement. The endorsement was made in February, 1963, but the banker dated it 1962 by mistake. Not long thereafter Ruebush died, but the testimony does not give the precise date.

The signature witness, Rauch, testified he was doing some work for Ruebush on the date of the note. When he came back from lunch, Ruebush was waiting in his car. When Simpson arrived, Ruebush got out, and told Rauch he had a note for Simpson, and asked him to fill in some blanks. Ruebush stood by him in a position to see what he wrote. There were a few spots of moisture on the hood because there was some snow that day. The moisture started to soak the paper so Ruebush got an envelope from the car to put under the note. He testified Ruebush said he owed Simpson some money, and Simpson had agreed to work for him until he died for only $36 per week, which he stated was not enough wages, and he wanted Simpson to have it in later years. Rauch filled in all the blanks except payee, as Ruebush told him to write the date, the $60,000, 5%, the word "date" and "at death." The note

contained the usual recital of "value received." Then he directed that six months be on the first line, because he wanted his heirs to have time to settle his estate and the note. Rauch said the discoloration on the note was due to the moisture or perhaps to the other witness placing his gloved thumb on the note.

After the note was complete, Ruebush read it, said it was all right, and signed it; no one showed him where to sign. He handed the note to Simpson and later drove away.

The other signer testified the same as to the time and place, but stated he had gone into a building and when he came back the note was already filled out and signed by the others. When he was asked to sign as a witness, Ruebush explained that Ernest had been working for $36 per week, and if he continued to do so until the death of Ruebush, he wanted Ernest to have the farm for this note. Nothing was said about other debts.

Other facts in support of the claim are brought out from different sources in the evidence. Thus, it is clear that Ruebush owned a number of farms and dealt on a large scale in livestock. He supervised his farms and drove his own car for that purpose. The prevailing rate for a farmhand during the years that Simpson worked for Ruebush was $240 per month. We observe the defense made no attempt to deny that Simpson was paid much less. The Ruebush cancelled checks were available, and a handwriting expert had examined many of them, but none were offered in evidence.

The three witnesses present at the execution of the note could not recall definitely that Ruebush did or did not wear his glasses at the time.

The testimony for the defense included a witness who took over Simpson's farm contract in 1958 without paying anything for it. He indicated the farm was somewhat run down, and there was not much in the

way of livestock and machinery. He did not recall if Simpson had told him some livestock and machinery had been moved to Ruebush farms.

A handwriting expert testified to seeing many cancelled checks signed by Ruebush, and it was his opinion the signature on the note was genuine. It was his opinion that the smudges on the note were caused by scotch tape which may have attached something over part of the note above the signature, and that it had been there when Ruebush signed, but it had been removed before the two witnesses signed. He based this opinion largely on apparent jumps, or blanks, in the lines of the signature, and stated he had experimented with strips of scotch tape on paper. He made no mention of experiments under stated conditions, such as an envelope under the paper, to see if a pen crossing the flap of the envelope would cause a similar jump or blank.

A neighbor of the Simpson farm testified he drove past the farm frequently; he did not know how many hogs Simpson had, but at one time he had only one cow. He conceded there were hills and hollows on the farm which he had not examined, and there could have been livestock there which he had not seen.

Another neighbor said he had checked for white oak timber on the Simpson farm, and during his check, he had walked all over the farm and saw only one cow, two sows and pigs. On cross-examination he admitted he made the check for Paul Singer, the owner of the farm before Simpson bought it, and he did not remember in what year he had made the check.

Another neighbor had helped get stray cows back for Simpson, also a Hereford bull. He had seen two brood sows and some shoats. He did not know what other livestock there was, except he knew there were a few Hereford cattle.

A livestock broker told of selling a few extra bull calves to Simpson about 1956 or 1957.

A daughter-in-law of Ruebush testified she had seen him at home by his radio at 11:30 a. m. on the date of the note and again about 3:30 p. m.

The Ruebush widow testified her husband discussed business matters with her, but he had never mentioned buying livestock from Simpson, never mentioned giving Simpson a note for $5,000 or for $37,500. Ruebush owned six or seven farms besides land at Camp Ellis. She did not believe he would buy machinery for this large acreage without telling her.

An optometrist testified he had examined Mr. Ruebush's eyes in 1963 and his vision was very bad. He doubted that four years before Ruebush could drive a car or read without glasses.

This is the extent of the testimony for the defense. It will be observed there is no attempt to controvert the fact that Simpson had bought a house in Macomb and improved it and that he traded a $7,000 investment as a down payment on the farm, which he later turned over to Stimson for nothing, at the request of Ruebush. We have noted that there is no attempt to deny that Simpson was being paid much less than the going rate. There is some indication that counsel for the estate computed some time that Simpson worked for Ruebush as being 76 weeks. This appears to be based on one and one-half years in 1955 and 1956. It is not claimed that Simpson did not work for Ruebush for the farm year 1952–1953, and again in 1955 until July 1956, and from January, 1958, until Ruebush's death in 1963, a period of more than five years.

██ We also observe that the evidence for the defense, at best, may show inadequacy of consideration, but falls far short of the claim that there was total want of consideration. Inadequacy of consideration

61

is not a defense. Smith v. Smith, 340 Ill 34, 39, 40, 172 NE 32.

 The rules of law applicable to this situation are fairly simple. There is no doubt that a promissory note intended as a gift is without consideration and does not form a basis for a claim. Stump v. Dudley, 207 Ill App 587; Kelly v. Dyer, 359 Ill 46, 194 NE 255. Of course, this rule applies to a note payable at death, and if the proof discloses there was no consideration, the claim is properly disallowed. Hershe v. Estate of Rinkenberger, 286 Ill App 494, 3 NE2d 953; Forbes v. Williams, 13 Ill App 280; Graves v. Stafford, 41 Ill App 659.

██ The latter case also commented that if there was some legally valid consideration for a note payable at death, the claimant might recover on the note pro tanto to the amount of the valid consideration. It is also interesting to observe that in the Forbes case, the court stated that if the deceased agreed to pay an employee 10 times the amount for which he could have procured like services, it would be competent for him to agree to it, and thereby bind his estate. See also, Zeigler v. Illinois Trust & Sav. Bank, 245 Ill 180, 189, 190, 91 NE 1041. We add that a note payable at or after death is regarded as due at a time certain, and not a defect of itself. Campbell v. Thompson, 192 Ill App 415.

██ Claims for services rendered and other considerations are commonly based on an oral contract, or even an implied promise to pay, unsupported by any written document. If there is no family or fiduciary relation, and services are performed at the request of the deceased, the law implies a liability for the services in such amount as they are reasonably worth. In re Estate of Brumshagen, 27 Ill App2d 14, 169 NE2d 112.

There is positive proof in this record that the claimant did perform services during a number of years, and there is nothing to the contrary, nor any attempt to deny that he was paid hardly more than half the prevailing rate.

■■ On top of these undisputed facts, there is the note bearing what is admitted to be the genuine signature of the deceased. Its introduction in evidence established a prima facie case for claimant. To support the attack upon the recital therein of value received, the attacking party has the burden of proving the defense by a clear preponderance of evidence. Campbell v. Thompson, 192 Ill App 415; In re Estate of Petit, 331 Ill App 620, 73 NE2d 796 (Abst.).

■ The brief for the estate argues that statements attributed to a dead man are subject to suspicion, and must be received with caution. But here we have not only oral statements, but a signed document, witnessed by two disinterested persons. The law attaches great importance to a man's signature, and a document is not to be compared to oral statements. The presumption is in favor of the correctness, genuineness, and regularity of writings. 18 ILP, Evid, Section 30.

Upon signing the note, the maker took the somewhat unusual precaution of asking two disinterested persons to sign as witnesses to his signature.

We do not say that the court is required to allow the claim in full if the trial court finds some basis for the assertion that part of it was a gift, but this basis must have positive evidence to support it.

■ As for the testimony of the handwriting expert, the two witnesses to the signature were not discredited, nor impeached on any material matter, and their direct and positive testimony cannot be overcome by the opinion of an expert witness. In Jones v. Jones, 406 Ill 448, 94 NE2d 314, the court reviewed a number

63

of precedents involving expert testimony. The opinion mentions that this type of opinion testimony is unsatisfactory since there is much room for error, and great temptation to form opinions favorable to the party calling the witness. At Page 451 it is stated,

> "Expert testimony has its useful place, but being an opinion, it has less weight than direct testimony on a controverted fact. It is not the policy of the law to permit facts positively established by eye witnesses to be overcome by opinions, except possibly when the eye witnesses have been discredited or impeached. To do so would put a premium upon secondary evidence, not justified by any known rule of law."

This case has been followed recently in First Nat. Bank of Chicago v. Rovell, 51 Ill App2d 282, 201 NE2d 140.

The failure of this expert to test a ball point pen with an envelope under paper similar to the note, is an example of how an expert can seek to back an opinion favorable to the side that called him.

The existence of the note is the only reasonable explanation in evidence for the fact that Simpson agreed to work for Ruebush the rest of the latter's life at only $36 per week. He should not be put in a worse position for having a note, than one relying upon oral promises.

The defense called as a witness the man to whom Simpson assigned his farm contract. It did not call the person from whom Simpson bought a house in Macomb, nor the person to whom this house was traded as a down payment on a farm. It is in evidence that his name was Paul Singer. The failure to call available witnesses is an indication that their testimony did not support the position of the estate. Chicago City Ry. Co. v. Duffin, 126 Ill 100, 109, 18 NE 279; Beery v. Breed, 311 Ill App 469, 36 NE2d 591. The

court allowed nothing for the loss of this $7,000 equity, a ruling which cannot be justified on this record. Also, no attempt was made to show that the machinery delivered to Camp Ellis, as listed in evidence, did not compare with what was there. There is nothing to disprove this delivery, except the widow's belief Mr. Ruebush would have told her about it, and had not done so. The failure to produce any direct contradictions of the claims made makes an inadequate case for the defense.

As previously noted, if there is any obligation to pay for services not easily valued, the deceased might estimate their value at any sum he chose. Graves v. Safford, 41 Ill App 659, 661. Accordingly, there appears no reason to deprive the claimant of his 1955 bonus of $5,000 and 1956 bonus of $4,000, both of which were included in the note, unless the court finds some basis, not perceived by us, to regard these sums as gifts.

Even if the court finds good reason to look upon the $60,000 as partly a gift, surely this should not deprive claimant completely of the fruits of years of labor, thrift, and sacrifice. At the very least, he should recover the difference between the customary rate of pay and what he actually received, besides the other considerations. We must also consider the propriety of ignoring Ruebush's agreement that, if Simpson would work for him the rest of his life at $36 per week, he would compensate Simpson for the loss on his abandonment of his farm investment. Ruebush told Rauch that Simpson had agreed to work for Ruebush the rest of the latter's life at $36 per week. This is a contract, now fully performed by Simpson in the ensuing five years, and we perceive no basis for regarding this amount as a gift.

Unless the testimony of the widow that her husband never mentioned buying anything from Simpson, is taken as completely refuting the testimony of Simpson

as to his sales, surely he is entitled to some allowance even if the court discounts the quantity claimed. If Ruebush failed to inform her of the note in evidence, that surely could not make the note cease to exist.

As for the testimony of the optometrist, that Ruebush could no drive a car or read without glasses, four years prior to his examination, we call attention to the fact that Rauch says Ruebush read what he had written before signing. He had evidently driven to this place in his car, and after the note was completed and delivered, he drove it away. This would indicate that Mr. Ruebush did have his glasses at the time, even though those present could not recall definitely on this point.

■■■■ The testimony in this case falls far short of presenting a clear preponderance of evidence to overcome the provisions of the note. Even if the amount is to some extent a gift, substantial consideration was proved, for which the estate is liable. For the reasons given, the judgment is reversed and the cause remanded for a new trial.

Reversed and remanded.

CULBERTSON, P. J. and ROETH, J., concur.