**FIRSTSOUTH, F.A., etc., Plaintiff,**

**v.**

**LaSALLE NATIONAL BANK, etc., et al., Defendants.**

**No. 86 C 10247.**

United States District Court,
N.D. Illinois, E.D.

April 24, 1991.

Thomas Dethlefs, Hopkins & Sutter, Chicago, Ill., for FDIC.

Richard Laubenstein, DiMonte & Lizak, Park Ridge, Ill., for Midwest.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Midwest Concrete Products Co. ("Midwest") has moved for summary judgment under Fed.R.Civ.P. ("Rule") 56 on its mechanic's lien counterclaim in this mortgage foreclosure action initially brought by FirstSouth Federal Savings & Loan Association ("FirstSouth"). FirstSouth later became, via corporate name change, First-South, F.A. At this point, however, Federal Deposit Insurance Corporation ("FDIC") has taken over this litigation as manager of the FSLIC Resolution Fund, as successor to Federal Savings and Loan Insurance Corporation as FirstSouth's receiver. This memorandum opinion and order deals with a critical issue of timing that has emerged from the parties' briefing of Midwest's summary judgment motion.

Illinois law teaches that the priority of claims as between a contractor or subcontractor on the one hand and a mortgagee on the other is a function of the priority as between (1) the date of *recording* of the mortgage—the date when the contractor or subcontractor is deemed to have constructive notice—and (2) the date of *execution* of the underlying contract pursuant to which the materials or services were provided by the contractor or subcontractor.[1] At least that is so where timely notice is given by the lien claimant and the claimed mechanic's lien is timely recorded in accordance with the Mechanics' Lien Act, which was undisputedly the case here.[2]

In this instance the mortgage under which FDIC claims its interest was dated February 22, 1984 and recorded with the DuPage County Recorder of Deeds on February 24, 1984. As for the construction contract, that was entered into between Whitehall Park Venture as owner and Milton N. Zic Associates ("Zic Associates") as contractor *and* as architect. But that was not an arms' length transaction, for both those entities were controlled by the late Milton Zic ("Zic"). Consequently Zic was the only one who signed the contract—the American Institute of Architects ("AIA") Standard Form of Agreement Between Owner and Contractor ("Agreement")—and he did so in two capacities: as President of Whitehall Park Development Corp., the general partner in Whitehall Park Venture, and as the principal in his own Zic Associates firm.

Midwest asserts that Zic (wearing his Zic Associates hat) then assigned the contractor's interest in the agreement to still another of his controlled entities, Milton N. Zic Construction Co. ("Zic Construction") in accordance with Paragraph 16.3 of the Agreement:

> The parties hereto agree that Contractor may assign this Contract to Milton N. Zic Construction Co. However, full responsibility and obligation of all contents of

---

**1.** As for the mortgage priority date, the recording date—when third parties such as contractors are charged with constructive notice—controls (see 27 I.L.P. *Mortgages* § 99, at 175 (1956 ed. with 1990 pocket part) and cases cited there). As for the lien claimant, Ill.Rev.Stat. ch. 82, ¶ 1 specifies:

> This lien attaches as of the date of the contract.

Thus the lien claimant in a situation such as that Midwest seeks to portray here—mortgage signed and delivered on day 1, construction contract signed and delivered on day 2, mortgage recorded on day 3—stands *ahead* of the mortgage (*Anderson & Lind Manufacturing Co. v. Walin Construction Co.*, 218 Ill.App. 379, 381–

82, 384 (1st Dist.1920). And if that is so, Ill.Rev. Stat. ch. 82, ¶ 16 also gives the lien claimant priority for work and materials that are provided even later than the date of the mortgage recorded after the construction contract date (see, e.g., *Detroit Steel Products Co. v. Hudes*, 17 Ill.App.2d 514, 518–19, 151 N.E.2d 136, 138–39 (4th Dist.1958)).

**2.** Even if the lien claimant loses absolute priority as a matter of the dates referred to in the text, Ill.Rev.Stat. ch. 82, ¶ 16 awards the claimant a prior lien in proportion to the enhancement in the real estate's market value stemming from the work or materials provided under the construction contract.

this Contract to the Owner will remain with Milton N. Zic Associates.

There is no document reflecting such an assignment, although some external documents (construction draw papers) bearing dates beginning in late March 1984 listed Zic Construction as the contractor.

Where the dispute between the parties arises is in determining just when the Agreement was actually executed and delivered. As originally prepared with typewritten inserts in the printed AIA form, it began this way (underlining indicates the typed insertions in the printed AIA form):

AGREEMENT

made as of the 1st day of February in the year of Nineteen Hundred and Eighty Four

As executed, though, a diagonal line was struck through "1st" and "23rd" was handwritten in just above that typewritten date. With Zic having since died, his widow Jacqueline Zic ("Jacqueline") has executed an affidavit in support of Midwest's summary judgment motion, but Midwest has been met with a motion to strike that affidavit. Before this Court may turn to Midwest's Rule 56 motion, this opinion must perforce address FDIC's motion to strike.

Jacqueline's affidavit identifies herself as having assisted Zic in preparing various documents relating to the construction of improvements at the Whitehall Park Development (she was a notary public and notarized a number of documents calling for such treatment). Here is what her affidavit states as to the critical date of contract execution:

3. On February 22, 1984, a contract was entered into between Whitehall Park Venture as owner and Milton N. Zic Associates as general contractor for construction of improvements at the property commonly known as 1950 West 35th Street, Oak Brook, Illinois (hereinafter referred to as the "subject premises"). A true and correct copy of the executed contract is attached as Exhibit B to Midwest's Motion for Summary Judgment.

But even apart from Jacqueline's unexplained reference to February *22* rather than *23* (which is the date quite clearly reflected in the handwritten interlineation), that affidavit cannot be credited. Here is what Jacqueline testified to on November 20, 1990, when she was deposed by FDIC after Midwest had filed her affidavit (Jacqueline Dep. 68–71):

Q. Now, you say [in the affidavit]: "On February 22, 1984, a contract was entered into between Whitehall Park Venture as owner and Milton N. Zic Associates as general contractor ..."

What do you mean by "a contract was entered into?"

A. That a contract was signed.

Q. On the 22nd of February, 1984?

A. I believe that was the day. Yes, it was made up on that day.

Q. Did you prepare this document?

A. No, the secretary.

Q. Now, if you'll look to page 8 of the document marked as Exhibit 6, it says at the top "Article 16," and then down at the bottom it has some signatures.

A. Yes.

Q. Were you present when this document was signed?

A. No.

Q. You didn't notarize this document, did you?

A. No.

Q. Do you know where it was signed?

A. No.

Q. The signatures on the bottom, the first one says "Owner, Whitehall Park Venture by Whitehall Park Development Corporation as General Partner and Owner's Agent, By:"

Whose signature is that? Do you know?

A. It's Milton Zic's signature.

Q. And then the signature on the right side under "Contractor, Milton N. Zic Associates," whose signature is that?

A. It's Milton Zic's signature.

Q. You don't know for a fact, do you, that this document was signed on February 22, 1984, do you?

A. No.

Q. Because you weren't present?

A. No.

Q. Have you ever seen this document—had you ever seen this document before you saw it signing the affidavit that we're looking to that was marked as Exhibit No. 5?

A. Did I see this before I signed that?

(Indicating)

Q. Did you see it any time before you looked at it when signing the affidavit? Let me make it easier.

You signed this affidavit marked as Exhibit No. 5 on August 6, 1990?

A. Yes.

Q. And on that day you looked at this document that's been marked as Exhibit 6?

A. No. This was in my office.

I had a copy of this, but I did not have it with me, no.

Q. Okay, let me back up.

Where did you sign the affidavit that's been marked as Exhibit No. 5?

A. Mr. Hansfield's office.

Q. And when you were in Mr. Hansfield's office, did you have before you a copy of the document that's been marked as Exhibit No. 6, the "Standard Form of Agreement Between Owner and Contractor?"

A. I don't believe so, no.

Q. When was the last time before today that you saw a copy of Exhibit No. 6?

A. February of 1984.

Q. That was the last time that you saw it?

A. Yes.

Q. When was the last—when did you first see a signed copy of this document that's been marked as Exhibit No. 6?

A. I don't know the exact date. That date it was brought in my office and left in my office.

What day, the 24th, 25th? I'm not sure.

Q. So the first time that you saw a signed copy of this document that has been marked as Exhibit No. 6 was on February 24th or 25th?

MR. HANSFIELD: Of 1984.

BY MR. DETHLEFS:

Q. Of 1984?

A. It may have been the 23rd. I'm not sure.

Q. You don't know when you first saw it, a signed copy of this document?

A. No, but it was around that time, and I brought it back.

■ Evidence is of course evidence, whatever form it may take. But anyone with even a modicum of experience knows that the form (if not the content as well) of affidavits is invariably lawyer-prepared, with the opportunity to introduce subtleties of language or meaning or both.[3] By contrast, live testimony comes directly from the witness, and the opportunity to cross-examine during a deposition gives opposing counsel the ability to lay bare any areas of doubt or dispute in a manner that is not available with an affidavit. Indeed, that distinction is at least one reason that supports the familiar summary judgment principle that post-deposition affidavits at odds with earlier sworn testimony will not be credited as creating a genuine issue of fact (*Bank Leumi Le–Israel, B.M. v. Lee*, 928 F.2d 232, 236–237 (7th Cir.1991) and cases cited there).

■ It is plain from the uncertainty reflected in Jacqueline's sworn *testimony*, then, that FDIC's motion to strike Jacqueline's *affidavit* must be granted. For she has there sworn to something she does not know: the date on which the Agreement was signed.[4] Nothing—not even the hand-

---

**3.** Indeed, Jacqueline's deposition testimony reflected that she had never seen Midwest's motion for summary judgment, which is referred to in a number of places in her affidavit (Jacqueline Dep. 71–72).

**4.** FDIC also attacks as beyond Jacqueline's knowledge her assertions in Aff. ¶¶ 4 and 5 that Zic Associates assigned the general contract to

M.N. Zic Construction Co., Inc. (which she identifies as the same entity as "Milton N. Zic Construction Co.," the permitted assignee under Agreement ¶ 16.3). On that score, it is quite right that Jacqueline's deposition testimony also confirmed that she did not have the requisite personal knowledge to make those assertions (Jacqueline Dep. 75–76, 79, 85–86, 106–07). But it is plain that, despite the absence of any for-

written interlineation reading "23rd"—supports her choice of "February *22*." And as for just when the document was changed to read "made as of the 23rd day of February" and signed twice by Zic,[5] Jacqueline's purported memory (remarkable enough in itself—how does she *really* know that something happened on one of three specific days seven years ago?) places the event either on one day that would give the lien claimant priority or on two other days that would not.

█ What Midwest has therefore been compelled to fall back on is that Jacqueline *can* verify the execution, authenticity and genuineness of the Agreement (see, e.g., *Buckingham Corp. v. Ewing Liquors Co.,* 15 Ill.App.3d 839, 842, 305 N.E.2d 278, 281 (1st Dist.1973)), though not its date of execution. For the latter element, Midwest relies not on Jacqueline's ambiguous testimony—ambiguous in the most critical respect—but rather on the legal presumption "that a written instrument was executed and delivered on the day of its date" (Midwest Mem. 5, citing *H.A. Pitt's Sons Mf'g Co. v. Poor,* 7 Ill.App. 24 (1880); *In re Estate of Ruebush,* 53 Ill.App.2d 54, 202 N.E.2d 344 (3d Dist.1964) and *Illinois National Bank & Trust Co. v. Holmes,* 311 Ill.App. 286, 35 N.E.2d 823 (2d Dist.1941)). Because FDIC is of course unable to offer any evidence controverting the handwritten "23rd" interlineation, Midwest urges that the presumption operates to compel a ruling in its favor.[6]

There is of course a reason for such a presumption of regularity. When people deal with each other at arm's length and put a date on a document to reflect when they have made that deal, they are ordinarily expected to choose and insert the real date. "Ordinarily" should be emphasized, for common experience teaches that is far from universally true. Every day people are backdating documents. Every day a letter or contract or some other document is dictated, then transcribed a day or two (or more) later, then signed—and all of us know that we do not invariably require that the final version be changed to reflect the later date on which pen is put to paper or the document is delivered. Indeed, Midwest's own *Illinois National Bank* case illustrates precisely that.

Yet the presumption of accurate dating—what *Illinois National Bank* referred to as merely prima facie—remains, in substantial part comforted by the fact that in a two-party transaction there will usually be something else (such as the incentive to use the true date, the recollection of either party, or some outside objective fact as to dating) to safeguard against inaccuracy. To be sure, sometimes it is in both parties' interest to use a date other than that of actual execution and delivery (note that the AIA printed form says "made *as of* ...," the common locution to permit people to select a date other than the physical date of signing if they want to). And yet the presumption exists for want of anything better.

But what of the situation that lacks whatever assurance is afforded by the existence of two parties in interest? Does

---

mal assignment, the construction company conducted itself as though it were the assignee while the owning entity treated it in the same manner, as shown by the entry into subcontracts and the mortgage draw requests made to FirstSouth. Under those circumstances that aspect of FDIC's objection, though technically accurate as to Jacqueline's affidavit, would not appear to be outcome-determinative on Midwest's effort to obtain summary judgment.

**5.** For the most part this opinion has spoken of the date of signing as though that were the operative fact, while the law of contracts of course looks to the date of delivery of a written agreement. Where as here Zic was dealing with himself—that is, he was on both sides of the transaction—no difference could ordinarily exist between those two dates, as it does frequently in other contract situations. But in this instance the date of delivery indeed appears to be different from the date on which "23rd" was interlineated—something made clear by the further factual discussion at the end of this opinion.

**6.** This Court, like others, has frequently commented that presumptions are tiebreakers, the legal equivalent of the baseball rule that ties go to the runner. Such tiebreakers come into play when neither party is able to adduce direct evidence on an issue, the situation that is presented here as to the execution date of the Agreement.

the presumption operate where the same person is on both sides, free to select any date that he or she wants? This Court posed that question to counsel after their initial submissions, inviting them to search in Illinois and elsewhere for legal authority dealing with the issue. They have reported back with nothing, so it has been left to this Court to rule without the benefit of precedent applicable to this set of facts.

Where does logic lead us? It should be remembered that Zic was an architect and contractor and real estate developer putting together a major project. It was he who obtained the FirstSouth mortgage—one that (as in every complex real estate deal) was necessarily in gestation for some substantial period before the names were affixed to the dotted line. And again as in every complex real estate deal, the construction contract also did not spring up full blown on a single day when it was both drafted and signed. It has already been said more than once that the Agreement was originally prepared "as of February 1, 1984"—what has not been said before now is that internal evidence suggests an original preparation date of February 10 despite the earlier "as of" date.[7]

What is important about the totality of the circumstances is that Zic himself negotiated for and obtained a first mortgage. Anyone with far less experience in real estate than such an architect-contractor-real estate developer knows the significance of the priority of events in determining whether a first mortgage is really a first lien or must rather get into line behind a host of contractors, subcontractors and materialmen. Nothing suggests that First-South as first mortgagee was agreeing to a deal that would render its own lien junior rather than senior to those who would provide materials and services intended to be paid for with the mortgage funds that FirstSouth was to advance (unless, of course, those materials and services became entitled to priority on an enhancement basis, so that the value of the first mortgage lien would not be impaired). And the only reasonable inference, of course, is that Zic and his lawyers necessarily knew what kind of deal they themselves had struck with FirstSouth as first mortgagee.

From the sheer logic of matters, then, this Court had determined from the parties' submissions that at least the inference might be drawn that Zic had affixed a date to the Agreement that was not necessarily the actual date of its execution, but instead a date chosen deliberately *later* than the mortgage date to make the Agreement junior to the mortgage—perhaps without realizing the difference in timing between the mortgage's execution date and its date of recording. At a minimum, that appeared to be a logical inference that would block the entry of summary judgment in Midwest's favor on a bare record such as that tendered to this Court.

But then this Court went further: It did some looking into the facts of the case that should have been the job of the lawyers. Among the documents that had been tendered on still another pending motion for summary judgment—a motion brought by FDIC against the Association of Franciscan Fathers of the State of Illinois ("Franciscan Fathers"), dealing with the relative priorities of the FirstSouth mortgage and Franciscan Fathers' purchase money mort-

---

**7.** Agreement ¶ 16.2 lists among the Contract Documents all of the architects' drawings "listed in Exhibit 'B'." Most of those drawings are dated 2/10/84, so that it must be viewed as virtually certain that the document was prepared not earlier than that date despite its original "as of" February 1 date. FDIC's counsel urges that the Agreement must have been prepared after *May* 10, 1984, pointing to the numerous 5/10/84 dates specified for various drawings in the 14–page drawings list attached to the Agreement. But that reflects a careless reading of the Agreement, for all those 5/10/84 dates are under a column headed "Exhibit 'D'," which under Agreement ¶ 16.2 is described as listing "Additional Drawings to be included as part of this Agreement within 90 days from the Closing of the Construction Loan." From the document itself, then, the strongest inference is that the Agreement was likely originally prepared on or very close to February 10, 1984 (with 90 days later, or May 10, 1984, being designated as the contemplated date for completion of the additional drawings).

gage—are these: [8]

1. Zic's letter of February *20*, 1984 to FirstSouth in Pine Bluff, Arkansas (Franciscan Fathers Ex.F, attached to this opinion), which enclosed among other "documents required for the Construction Loan Closing" what it referred to as the *signed and executed* Agreement—and that document had the typewritten "1st day of February" date, *not* the handwritten "23rd" interlineation (Franciscan Fathers' Ex.H);

2. Zic's letter of direction to LaSalle National Bank dated February 22, 1984, directing it to execute the various mortgage documents and then to deliver them to the Jenner & Block law firm (Franciscan Fathers Ex.J);

3. Jenner & Block's February *23*, 1984 letter of opinion addressed to FirstSouth (Jenner & Block were then acting as counsel for (a) Whitehall Park Venture as borrower, (b) LaSalle National Bank as trustee under the land trust and (c) Zic as guarantor) expressing the law firm's opinion (among other things) that the FirstSouth mortgage would become a valid first lien on the real estate upon its recording, and spelling out in substantial detail the Illinois law of mechanic's liens and the same kinds of priority considerations that have been described in this opinion (Franciscan Fathers' Ex.X).

This Court has never claimed prescience for itself. In this instance, though, those later-discovered facts have confirmed the selfsame destination to which this Court's own logic and experience had taken it. Indeed, those added facts are substantially more adverse to Midwest's position:

1. As it turns out, there can be no question at all that *someone other than Zic* inserted the handwritten "23rd" in the original Agreement that he had mailed to FirstSouth in Pine Bluff, Arkansas on February 20.

2. And whoever that someone may have been (the strong inference is that it would have been someone at FirstSouth itself), and whenever that interlineation may have been made, it seems almost certain that the intention in changing the date was to render the Agreement junior rather than senior to the FirstSouth mortgage.

3. Even more critically in that respect, now that it is known that Zic had parted company with the physical document on February 20, 1984—and apparently before it was intended to become effective—the date of delivery rather than the date placed on the document becomes relevant.

4. And on that score, the most powerful inference must be that the date of delivery (which would have involved return of the Agreement from FirstSouth in Arkansas to Zic in Illinois) took place *after* the FirstSouth mortgage was recorded on February 24.

This Court is not so ruling as a matter of law at this point. But what has become plain beyond peradverture is that Jacqueline's affidavit is false. It is unnecessary to be so unkind as to say that she deliberately lied in her affidavit or in her deposition or both. Instead the matter may be viewed more charitably as an example of the familiar phenomenon that the wish is father to the thought. For the present, all that is necessary is to strike Jacqueline's affidavit, and this Court so orders.

---

**8.** This Court can of course take judicial notice of the court record in this action, including such filed documents.

APPENDIX

MILTON N. ZIC ASSOCIATES ARCHITECTS·DESIGNERS·CONSULTANTS
Lake Point Tower 505 North Lake Shore Drive Chicago IL 60611 312/828-9773

February 20, 1984

FIRSTSOUTH Federal Savings & Loan
6th and Pine
Pine Bluff, Arkansas 71611

Attention: Mr. Dan Wingard

Re: Whitehall Park Development
 Oak Brook, Illinois

Dear Mr. Wingard:

Enclosed are the following documents required for the Construction Loan
Closing:

1. Acceptance and Binder for $1,000,000 Life Insurance Policy from
 Jackson National Life.

2. Following signed and executed contracts:

 A. Standard Form of Agreement Between Owner and Architect/Engineer.

 B. Standard Form of Agreement Between Owner and Contractor.

 C. Management Agreement Between Whitehall Park Development Corporation
 and Whitehall Park Venture.

 D. Standard Form of Agreement Between Owner and Subcontractor
 for the following:

 - Site Electrical
 - Site Demolition
 - Site Excavation

 Note: Contracts for Site Paving and Underground Site Utilities
 will be given to you at Closing.

3. Instruction letter for Dispersements.

4. Copy of invoice dated 12-31-83 from Adams & Myers Realtors.

A010202

**EXHIBIT**
F

FS1-111261

**1496**

FIRSTSOUTH Federal Savings & Loan
Mr. Dan Wingard
February 20, 1984
Page Two

5. Letters re: Playboy Hotel - Casino

 A. From Robert E. Bard

 B. From Milton N. Zic

Sincerely,

Milton N. Zic

MNZ/bcj
Enclosures

cc: Jenner & Block

FS1-111262

A010203

MILTON N. ZIC ASSOCIATES ARCHITECTS·DESIGNERS·CONSULTANTS

Lake Point Tower 505 North Lake Shore Drive Chicago Ill. 60611 312/828-9773